BONNETT FAIRBOURN FRIEDMAN
& BALINT, P.C.
Andrew S. Friedman (AZ005425)
afriedman@bffb.com
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Tel: (602) 274-1100
Fax: (602) 274-1199

*Liaison Counsel for Lead Plaintiffs*

KIRBY MCINERNEY LLP
Ira M. Press (*pro hac vice*)
ipress@kmllp.com
Mark A. Strauss (*pro hac vice*)
mstrauss@kmllp.com
825 Third Avenue, 16th Floor
New York, NY 10022
Tel: (212) 371-6600
Fax: (212) 751-2540

*Lead Counsel for Lead Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| **In re AudioEye, Inc. Sec. Litig.,** | **CV-15-163-TUC-DCB (LEAD)**<br><br>**CLASS ACTION**<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR TRIAL BY JURY** |

## TABLE OF CONTENTS

I. SUMMARY OF THE ACTION ....1

II. JURISDICTION AND VENUE ....5

III. PARTIES ....5

A. Plaintiffs ....5

B. Defendants ....6

IV. SUBSTANTIVE ALLEGATIONS ....7

A. Background ....7

B. Applicable Accounting Principles ....7

C. Defendants' Revenue-Inflation Scheme .... 10

D. The Revelation that the Company's First, Second, and Third Quarter 2014 Financials Would Have to be Restated .... 12

E. The Company's Post-Class Period Admissions .... 14

V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS .... 16

VI. LOSS CAUSATION .... 30

VII. ADDITIONAL *SCIENTER* ALLEGATIONS .... 33

A. The Magnitude of the Restatements and the Simplicity of the Accounting Principles Violated .... 34

B. Defendant O'Donnell's Role in Responding to the SEC, His Resignation, and the Claw-Back of His Incentive Compensation .... 36

C. The Timing of the Restatement .... 38

D. The Company's Small Number of Employees .... 38

E. Defendants Were Motivated to Continue to Attract Capital from Accredited and Institutional Investors .... 38

VIII. PLAINTIFFS' CLASS ACTION ALLEGATIONS .... 40

COUNT I: FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS .... 42

COUNT II: FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS .... 46

PRAYER FOR RELIEF ........................................................ 47
JURY TRIAL DEMANDED ........................................................ 48

By and through their undersigned counsel, Lead Plaintiffs Globis Capital Partners, L.P. and Globis Overseas Fund, Ltd. (collectively, "Plaintiffs") allege the following against defendants AudioEye, Inc. ("AudioEye" or the "Company"), Nathaniel Bradley ("Bradley"), and Edward O'Donnell ("O'Donnell") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon information and belief based on the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by AudioEye and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants; (c) review of news articles, analyst reports, and shareholder communications; (d) review of other publicly available information concerning Defendants and related non-parties; and (e) consultation with experts.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## I. SUMMARY OF THE ACTION

1. This is a federal securities class action against AudioEye and certain of its officers for violations of the federal securities laws. Plaintiffs bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of themselves and a class (the "Class") consisting of all persons or entities who acquired shares of AudioEye stock during the period between May 14, 2014 through April 1, 2015 (the "Class Period"). Plaintiffs allege that, during the Class Period, Defendants engaged in a fraudulent scheme to artificially inflate the Company's stock price by overstating the Company's revenues by more than 3,000%. As a result

of this fraud, as described more fully below, shareholders suffered millions of dollars in losses.

2. AudioEye is an internet technology company that provides enhanced access and usability for its clients' websites through a patented technology that delivers an audio equivalent of a visual or mobile website in a format that can be navigated, utilized, interacted with and transacted from, without the use of a monitor or mouse, by individuals with visual impairments.

3. In the first three quarters of 2014, Defendants reported that the Company sold thirty-six licenses for its intellectual property to a total of at least twenty-two different customers. Defendants claimed that these licensing transactions generated revenues for the Company of $225,000 per license, for aggregate revenues of $8.1 million – a material increase over the $1.4 million in revenues that the Company had reported in the entire of 2013.

4. The licensing transactions did not involve the receipt of cash by the Company. Instead, the transactions were "nonmonetary," wherein the Company provided its technology to each customer in exchange for services to be provided by the customer and/or technology licenses belonging to the customer.

5. Throughout the Class Period Defendants assured investors that the Company complied with General Accepted Accounting Principles ("GAAP") in recognizing the revenues from the nonmonetary licensing transactions.

6. Specifically, Defendants claimed that the Company "follows" Accounting Standards Codification ("ASC") 845-10-30-1, which allows companies to report revenue from nonmonetary transactions based on the "fair values" of the assets they receive in those transactions, provided that "fair value" is "determinable within reasonable limits." If fair value is not "determinable within reasonable limits,"

transactions are required to be accounted for based on the recorded book value of the assets that the reporting entity "relinquished" in the exchange.

7. During the Class Period Defendants repeatedly represented that the Company's nonmonetary licensing transactions met the requirements of ASC 845-10-30-1, including that "fair value" was "determinable within reasonable limits."

8. On February 6, 2015, Defendant O'Donnell explained the basis for the Company's "fair value" determinations in a letter to the SEC that was publicly filed on the SEC's EDGAR electronic filing system ("EDGAR"). Specifically, Defendant O'Donnell stated that the Company based those determinations on the "standard billing rates" of its customers, *i.e.*, "those entities' standard billing rates for similar services provided to third-party customers . . . and all of which are substantive and in the normal course of business that these Company customers conduct with their respective customers."

9. In fact, however, as investors later would learn, the Company did not possess any evidence or backup documentation confirming that the supposed "standard" rates or prices used to determine the fair values reflected actual market transactions. Instead, the Company and its counterparties simply had contrived those numbers out of thin air for purposes of reporting inflated revenues.

10. On April 1, 2015, investors in AudioEye stock began to learn the truth. On that day, the Company issued a press release announcing that the Company's first, second, and third quarter 2014 financial statements "cannot be relied on and that material restatements will be forthcoming."

11. The release went on to state that the Company anticipated erasing *all* of the previously reported $8.1 million in revenues from the thirty-six nonmonetary licensing transactions.

12. The press release also revealed that, effective March 29, 2015, Defendant O'Donnell had resigned from his position as the Company's CFO.

13. As a result of the April 1, 2015 revelations, AudioEye's stock price plummeted 26% on unusually heavy trading volume, falling from a close of 41 cents per share on March 31, 2015, to a close of 30.5 cents per share on April 1, 2015, causing millions of dollars in investor losses. In the days that followed, AudioEye stock continued to decline, sinking to less than 10 cents per share on April 21, 2015.

14. On May 18, 2015, the Company filed amended Form 10-Qs for the first, second, and third quarters of 2014, restating those quarters' financial statements. As anticipated, the restatements erased all $8.1 million of the revenues previously reported by the Company in connection with the nonmonetary licensing transactions.

15. The restatements additionally admitted the reason for those revenues' removal – specifically, that there was a complete "absence of documentation to support [the] transactions" upon which the Company's purported fair value measurements were based, including a "failure to trace the delivery of services."

16. In other words, the Company had no evidence or backup documentation establishing or confirming the supposed "standard" rates or prices used to determine fair value, or that any third-party transactions even had occurred. Hence, at no time during the Class Period were the fair values of the services or licenses that the Company received "determinable within reasonable limits." Consequently, GAAP required the transactions to be recorded at the book values of the Company's own licenses, which were zero.

17. The scheme had continued through three quarters of unaudited financial statements until the SEC demanded backup documentation which the Company did not have and which did not exist, finally putting an end to the ruse, but not before Defendants were able to take advantage of the stock price inflation to raise $8.1 million

from a series of private placements of the Company's securities and warrant exchange offers during the Class Period.

## II. JURISDICTION AND VENUE

18. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

19. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa), and 28 U.S.C. §1391(b). Many of the false and misleading statements and omissions were made in or issued from this District. AudioEye's principal executive offices are located at 5210 E. Williams, Circle, Suite 500, Tuscon, Arizona 85711, and many of the acts and transactions giving rise to the violations of law complained of occurred in this District.

20. In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiffs

21. Plaintiffs Globis Capital Partners, L.P. and Globis Overseas Fund, Ltd. were appointed as Lead Plaintiffs in this action by Order of this Court dated July 31, 2015 [ECF No. 35]. As shown in Plaintiffs' certification filed with the Court on June 15, 2015 [ECF No. 14-1] and incorporated herein, Plaintiffs purchased AudioEye common stock at artificially inflated prices during the Class Period and suffered economic loss when the true facts about the revenues supposedly derived from the

nonmonetary licensing transactions were disclosed, and the stock price resultantly declined.

**B. Defendants**

22. Defendant AudioEye focuses on creating voice driven technologies to enhance the mobility, usability, and accessibility of the Internet based content in the United States. The Company has a cloud-based cross-platform/cross-browser reader solution for accessible web browsing. The Company owns patented technology that changes vision-dependent user experiences on the computer (such as keypads and mice) to a voice-driven medium. AudioEye is a Delaware corporation headquartered in Tucson, Arizona and trades on the OTCQB Venture Marketplace ("OTC") under the ticker symbol "AEYE."

23. Defendant Nathaniel Bradley ("Bradley") has served as the Company's President and Chief Executive Officer ("CEO") at all relevant times.

24. Defendant Edward O'Donnell ("O'Donnell") at all relevant times served as the Company's Chief Financial Officer ("CFO") until his resignation on March 29, 2015.

25. Defendants Bradley and O'Donnell are sometimes referred to as the "Individual Defendants."

26. During and prior to the Class Period, the Individual Defendants, as senior executive officers of AudioEye, were privy to confidential and proprietary information concerning AudioEye, its operations, finances and financial condition, including material adverse nonpublic information concerning AuidoEye's nonmonetary licensing transactions, as alleged below. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

27. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of AudioEye's business.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background

28. As alleged above, AudioEye is an internet technology company that focuses on the provision of "voice driven" technologies. The Company's stated business strategy during the Class Period was to commercialize its intellectual property by generating revenues through the licensing of its technology.

29. In the periods immediately prior to the Class Period, the Company reported strong revenue growth. The Company reported revenues of $125,521 for the year ended December 2011, $279,062 for the year ended December 2012, and $1.4 million for the year ended December 2013.

30. Defendants were eager to continue to report accelerating revenue growth in 2014.

### B. Applicable Accounting Principles

31. As a public company, AudioEye was required to comply with, among other things, the Securities Act, the Exchange Act, and the regulations of the SEC. These laws and regulations are intended to protect the investing public by ensuring that public companies like AudioEye fairly, accurately, and timely report their financial results and condition.

32. To ensure fair and accurate reports to the investing public, the federal securities laws and the SEC's regulations promulgated thereunder require public companies such as AudioEye to prepare and present their reports and financial statements in conformity with GAAP. Financial statements filed with the Commission that are not prepared in accordance with GAAP are presumed to be misleading and inaccurate. Regulation S-X § 210.4-01 [17 C.F.R. § 210.4-01]. The Financial Accounting Standards Board ("FASB") Accounting Standards Codification is the source of authoritative GAAP recognized by the FASB to be applied by nongovernmental entities (Accounting Standards Codification ("ASC") Section 105-10-05-1).

33. Most business transactions involve exchanges of cash or other monetary assets for goods or services. The amounts of cash or monetary assets exchanged generally provide an objective basis to value those transactions.

34. Some transactions, however, involve exchanges of nonmonetary assets or services. Accounting for such transactions is governed by ASC 845-10-30-1, which states the general principle that accounting for nonmonetary transactions should be based on the "fair value" of the assets or services exchanged. Typically, the fair value of the asset "surrendered" or "relinquished" by the reporting entity in the exchange is used to account for the transaction. However, if the fair value of the asset that the reporting entity received is more "clearly evident," that is to be used to measure the transaction.

35. Specifically, ASC 845-10-30-1 states, in pertinent part:

> In general, the accounting for nonmonetary transactions should be based on the fair values of the assets (or services" involved, which is the same basis as that used in monetary transactions. Thus, the cost of a nonmonetary asset acquired in exchange for another nonmonetary asset is the fair value of the asset surrendered to obtain it, and a gain or loss shall be recognized on the exchange. *The fair value of the asset received shall be used to*

> *measure the cost if it is more clearly evident than the fair value of the asset surrendered.*[1]

36. ASC 845-10-30-1, however, is subject to an important requirement. Specifically, fair value must be "determinable within reasonable limits." If fair value is not "determinable within reasonable limits," the transactions are required to be accounted for based on the recorded book value of the assets that the reporting entity "relinquished" in the exchange.

37. ASC 845-10-30-3 states, in pertinent part:

> A nonmonetary exchange shall be measured *based on the recorded amount* . . . of the nonmonetary asset(s) relinquished, and not on the values of the exchanged assets, if . . . (a) *The fair value of neither the asset(s) received nor the asset(s) relinquished is determinable within reasonable limits*. . . . .

38. Fair value determinations are subject to ASC 820. ASC 820-35-2 defines "fair value" as "the price that would be received to sell an asset . . . in an orderly transaction between market participants at the measuring date." ASC 820-1-05-1B emphasizes that "fair value is a market-based measurement . . . ." Under ASC 820-35-24, reporting entities are required to use "valuation techniques that are appropriate in the circumstances *and for which sufficient data are available* to measure fair value maximizing the use of relevant observable inputs and minimizing the use of unobservable inputs."

39. The primary valuation technique is the "market approach," which uses observed prices and other relevant information generated by market transactions involving identical or comparable assets. *See* ASC 820-55-3A. An example of the "market approach" would be to estimate the value of a security based on quoted prices

---

[1] All emphasis herein is supplied unless otherwise indicated.

in active markets for identical securities, or, if no such markets existed, on comparable securities.

40. Another example of the "market approach" would be to value a technology license based on prices paid for similar licenses or services in actual cash transactions, *i.e.*, the method that AudioEye purported to implement here.

**C. Defendants' Revenue-Inflation Scheme**

41. In the first three quarters of 2014, Defendants reported that the Company sold thirty-six licenses for its intellectual property – four licenses in the first quarter,[2] thirteen licenses in the second quarter, and nineteen licenses in the third quarter. Defendants claimed that these licensing transactions generated revenues for the Company of $225,000 per license, for aggregate revenues of $8.1 million. This comprised 92% of the Company's total revenues reported in those quarters of $8.8 million.

42. Throughout the Class Period, Defendants repeatedly assured investors that the Company complied with GAAP in recognizing the revenues from the nonmonetary licensing transactions.

43. Specifically, as set forth in detail below (*see* ¶¶66, 81, 91), Defendants claimed that the Company "follows" ASC 845-10-30-1, and that the nonmonetary licensing transactions "were determined to meet" or "met" the criteria of that provision, including that "fair value" was "determinable within reasonable limits."

44. Furthermore, seizing upon the advantage of the Company's inflated stock price during the Class Period, Defendants raised $4.4 million in proceeds from accredited and institutional investors in four separate private placements of the

[2] The Company initially reported that one licensing transaction in the first quarter of 2014 was for "cash." In the second quarter of 2014, however, the Company reclassified that "cash" transaction as "nonmonetary."

Company's securities, and an additional $3.7 million in proceeds from holders of warrants on the Company's stock in two separate warrant exercise offers, as alleged in detail below in ¶¶144-46.

45. On December 3, 2014, the SEC issued a letter to Defendant O'Donnell, as CFO, questioning the Company's accounting for the nonmonetary licensing transactions. The letter, which was filed on EDGAR, asked, *inter alia*, why the Company did "not record licenses at historical cost [*i.e.*, recorded book value] in transactions where you engage in a non-cash exchange of a license for the license of a customer."

46. Defendant O'Donnell responded by letter filed on EDGAR dated December 15, 2014, asserting, *inter alia*, that "[t]he fair value of the technology or services exchanged or received is determined within reasonable limits . . . ."

47. On January 16, 2015, the SEC issued a follow-up letter to Defendant O'Donnell, which was also filed on EDGAR, stating, *inter alia,* that "[i]t remains unclear to us how you determined the fair value of the licenses involved in the exchange. . . . Please advise." The SEC also asked Defendant O'Donnell for "your analysis of each of these licenses that supports the culmination of the earnings process by demonstrating . . . [that the] fair value of the product received or exchanged exists . . . ."

48. Defendant O'Donnell responded by letter filed on EDGAR dated February 6, 2015, further purporting to explain the Company's fair value determinations. Specifically, Defendant O'Donnell stated that the Company based those determinations on the "standard billing rates" of its customers, *i.e.*, "those entities' standard billing rates for similar services provided to third-party customers . . . and all of which are substantive and in the normal course of business that these Company customers conduct with their respective customers."

49. For example, the Company sold its licenses to one customer in exchange "for consulting, geographic and location setup services . . . at [the customer]'s standard client rate of $200 per hour for 1,125 hours in total, for a total value of $225,000. *Other clients of this service provider have paid $200 per hour in cash, supporting the Company's assertions on fair value. . . ,*" Defendant O'Donnell stated in the letter.

50. Notably, the Company failed to provide the SEC with further backup documentation or evidence supporting the "standard" rates or prices charged by its customers in the transactions that the Company referenced in its letter to the SEC and that it used for the fair valuations. This is because no backup documentation or evidence existed. Rather, as investors later would learn, the Company and its counterparties simply had contrived the numbers out of thin air for purposes of reporting inflated revenues.

51. On March 12, 2015, the SEC issued a third letter to Defendant O'Donnell, which was also filed on EDGAR, setting forth additional questions regarding the Company's accounting for the nonmonetary licensing transactions.

52. On March 24, 2015, the Company filed a letter to the SEC on EDGAR, this time signed not by Defendant O'Donnell but, instead, by Defendant Bradley. The letter stated that the Company intended to respond to the SEC's March 12, 2015 letter by April 3, 2015.

**D. The Revelation that the Company's First, Second, and Third Quarter 2014 Financials Would Have to be Restated**

53. Because Defendants did not actually have evidence supporting the fair values of any of the technology or services that AudioEye received in any of the thirty-six nonmonetary licensing transactions from which it booked a total of $8.1 million in revenue, AudioEye was unable to respond to the SEC's March 12, 2015 inquiry.

54. Instead, on April 1, 2015, Defendants issued a press release announcing that the Company's first, second, and third quarter 2014 financial statements "cannot be relied on and that material restatements will be forthcoming." Specifically, the release stated, in pertinent part, that:

> [T]he Audit Committee of the Company's Board of Directors, based in part on the recommendation of the Company's management and in consultation with the Company's auditors and advisors, concluded that because of errors identified in the Company's previously issued financial statements, *the Company will restate its previously issued financial statements for the quarters ended March 31, June 30 and September 30, 2014*.
>
> The Audit Committee also authorized an internal review of controls and policies. Accordingly, investors should no longer rely upon the Company's previously released financial statements or other financial data for these periods, including any interim period financial statements, and any earnings releases relating to these periods. . . .

55. The release went on to state that the Company anticipated eliminating *all* of the previously reported $8.1 million in revenues from the thirty-six nonmonetary licensing transactions:

> Based on the review to date, *the Company anticipates removing all revenue derived from non-cash exchanges of a license of the Company for the license of the Company's customer and all revenue from non-cash exchanges of a license of the Company for services of the Company's customer*, and reducing by a material amount previously reported license cash revenue. The aggregate amount of revenue reported for the first nine months of 2014 for non-cash transactions was approximately $8,100,000. . . .

56. In other words, this was *not* a case of the Company having support for the value of only *some* of the thirty-six transactions. Nor was this a case of the Company having support for only *some* value of the technology and licenses received, but simply at levels below the $225,000 claimed. Rather, the Company had *no* support sufficient to recognize *any* revenue from *any* of the nonmonetary licensing transactions, which, as alleged above, comprised 92% of the Company's reported revenues during the first three quarters of 2014.

57. The release also stated that the Company expected to report "material weaknesses" in the Company's internal controls:

> In accordance with Section 404 of the Sarbanes-Oxley Act of 2002, the Company's management has been assessing the effectiveness of the Company's internal controls over financial reporting and disclosure controls. Based on this assessment, the Company *expects to report material weaknesses in the Company's internal controls and therefore conclude that internal controls over financial reporting and disclosure controls are not effective.*

58. The press release additionally revealed that, effective March 29, 2015, Defendant O'Donnell had resigned from his position as the Company's CFO.

59. As a result of the April 1, 2015 revelations, AudioEye's stock price plummeted 26% on unusually heavy trading volume, falling from a close of 41 cents per share on March 31, 2015, to a close of 30.5 cents per share on April 1, 2015, causing millions of dollars in investor losses. In the days that followed, AudioEye stock continued to decline, sinking to less than 10 cents per share on April 21, 2015.

**E. The Company's Post-Class Period Admissions**

60. On May 18, 2015, the Company filed amended Form 10-Qs for the first, second, and third quarters of 2014, restating those quarters' financial statements. As anticipated, the restatements erased all $8.1 million of the revenues previously reported by the Company in connection with the nonmonetary licensing transactions.

61. The restatements additionally admitted the reason for those revenues' removal – specifically, that there was a complete "absence of documentation to support [the] transactions" upon which the Company's purported fair value determinations were based, including a "failure to trace the delivery of services."

62. In other words, the Company had no evidence or backup documentation supporting the supposed "standard" rates and prices which the Company had used to determine fair value, or that any third-party transactions had even occurred. Apparently, those values simply had been contrived by the Company and its counterparties for

purposes of reporting inflated revenues. Hence, at no time during the Class Period were the fair values of the services or licenses that the Company received "determinable within reasonable limits." Consequently, GAAP required the transactions to be recorded at the book values of the Company's own licenses, which were zero.

63. Furthermore, the scheme had continued for three quarters of unaudited financial statements until the SEC demanded backup documentation which the Company did not have and which did not exist, finally putting an end to the ruse.

64. Specifically, the restated financials admitted that:

> The Company has restated its consolidated balance sheet as of September 30, 2014, and its consolidated statement of operations and consolidated statement of cash flows for the three and nine months ended September 30, 2014.
>
> * * *
>
> To recognize revenue on a non-monetary exchange of a license of its patents for services or licenses to be provided by a counterparty, . . . the Company applied ASC 845-10-30-1, holding that fair value of the services or licenses it would receive in each transaction was more clearly evident than the fair value of the asset surrendered. . . .
>
> *Under ASC 845, fair value in a license-for-services or license-for-license contract in which the cost of the asset being surrendered is not determinable can rely on the fair value of the asset received if it is determinable. . . . However, the Company has now determined following its Internal Review that in applying this methodology it did not have sufficient support to establish the value of the services or licenses provided under the subsequent license-for-services or license-for-license transactions*, did not adequately track the consulting services provided by the various counterparties, and did not have sufficient support to establish such services were actually provided as per the terms of the contracts.
>
> Following its Internal Review, the Company has determined that these errors resulted from material weakness in internal control over financial reporting . . . . In particular, the Company concluded that there was a misapplication of relevant accounting guidance and *the absence of documentation to support transactions including the failure to trace the delivery of services*.

65. The restated financials also admitted to "material weaknesses" in the Company's internal controls:

> We have concluded that there are *material weaknesses in our internal control over financial reporting*, as we did not maintain effective controls over the selection and application of accounting principles generally accepted in the United States ("GAAP") related to revenue recognition for certain nonmonetary transactions. . . . One material weakness related to our failure to maintain effective internal controls over the accounting for revenue recognition. Our Quarterly Reports on Form 10-Q have been amended . . . to reflect the restatement of our financial statements for the restated periods and the change in management's conclusion regarding the effectiveness of our disclosure controls and procedures and internal control over financial reporting . . . .

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

66. On May 14, 2014, Defendants filed the Company's 10-Q report for the first quarter of 2014 with the SEC. The report, which was signed by Defendants Bradley and O'Donnell, reported revenues of $1.03 million for the three months ended March 31, 2014, including $900,000 from four licensing transactions, three of which constituted "noncash exchanges" which the Company claimed "were determined to meet" the GAAP criteria for revenue, including that "[t]he fair value of the technology or products exchanged or received is determinable within reasonable limits." Specifically, the report stated in pertinent part:

> In transactions where the Company engages in a non-cash exchange for a license of the Company for the license of the Company's customer, the Company follows . . . ASC 958-845-10 [sic]. . . . *The fair value of the technology or products exchanged or received is determinable within reasonable limits* . . . . For the three months ended March 31, 2014, the Company sold one license for cash of $225,000 and exchanged the same license to three other customers for licenses to their intellectual property. The three licenses exhanged [sic] were determined to meet the aforementioned criteria and were each recognized as revenue and intangible assets for $225,000 each for a total of $675,000.

67. The report additionally represented that:

> The accompanying unaudited interim financial statements of AudioEye, Inc. and its wholly-owned subsidiary (collectively, the "Company") have been prepared in accordance with accounting principles generally accepted in the United States of America and the rules of the Securities and Exchange Commission . . . .
>
> In the opinion of management, all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of financial position

> and the results of operations for the interim periods presented have been reflected herein.

68. The report also set forth the Company's revenue recognition policies, which included the statement that "[r]evenue is recognized when all applicable recognition criteria have been met, which generally include . . . *a fixed or determinable price* . . . ."

69. The report additionally included signed certifications by each of the Individual Defendants pursuant to the Sarbanes-Oxley Act of 2002 ("SOX¨), attesting that the report did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period[s] covered by" those reports.

70. The SOX certifications also attested that the "financial statements and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

71. The SOX certifications additionally attested that the Individual Defendants were:

> Responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15-d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d- 15(f)) for the registrant and have:
>
> a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; [and]
>
> b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles . . . .

72. The statements referenced above in ¶¶66-71 were each materially false and misleading because, *inter alia*,

a. As Defendants would later admit, the fair values of the technology and products exchanged or received in the transactions were not "determinable within reasonable limits," and, hence, the criteria for recognizing revenue in connection with such transactions were not "met." Moreover, the Company recognized revenue in connection with the subject transactions despite the fact that there was no "fixed or determinable price . . . ."

b. The revenue numbers set forth above were materially false, as the Company later admitted. Specifically, the Company did not have $1.03 million in revenues in the first quarter of 2014, but only $45,652 because the nonmonetary licensing transactions did not generate $225,000 apiece in revenue, but, instead, zero dollars.

c. As Defendants would later admit, the financial statements were not "prepared in accordance with [GAAP]," did not comprise a "fair presentation" of the Company's financial position and results, and contained material misstatements in that they overstated the Company's revenues by $900,000 and were required to be restated.

d. As Defendants would later admit, the Company's internal controls were "not effective," and resulted in material overstatements of the Company's revenues.

73. The next day, on May 15, 2014, Defendants issued a press release regarding the Company's first quarter 2014 financial results, stating in pertinent part:

> **AudioEye, Inc. Reports First Quarter Revenue of $1.032 Million vs. $0.2 Million in Prior-Year Period**
>
> **Annualized Revenue "Run Rate" Approximates $4.1 Million in Most Recent Quarter**

> TUCSON, AZ--(Marketwired - May 15, 2014) - AudioEye®, Inc. (OTCQB: AEYE) ("AudioEye"), creator of the Audio Internet® patented audio browsing and automated publishing technology platform, today announced that its revenue for the first quarter of 2014 totaled $1,032,886. This represented an increase in recognizable revenue of approximately 360% when compared with first quarter 2013 revenue of $224,297.
>
> On a sequential basis, first quarter 2014 revenue increased 37% relative to fourth quarter 2013 revenue of $752,092. In addition to this quarter over-quarter revenue growth, AudioEye increased its gross profit margin from 76% of sales in the fourth quarter to 96% of sales in the most recent quarter.
>
> The Company's annualized revenue "run rate" in the first quarter of 2014 approximated $4.1 million.

74. The release also quoted Defendant Bradley as stating: "Our annualized revenue 'run rate' in the first quarter exceeded $4 million, and we believe AudioEye has the potential to achieve an annualized revenue 'run rate' of $8 million or higher within the next two quarters."

75. The statements referenced above in ¶¶73-74 were each materially false and misleading because, *inter alia*, the revenue figures set forth above were materially false, as the Company later admitted. Specifically, the Company did not have $1.03 million in revenues in the first quarter of 2014, but only $45,652. Hence, Defendants' statements regarding the Company's revenues and its "annualized revenue 'run rate'" were materially false.

76. On July 2, 2014, Defendants issued a preliminary release with respect to the Company's financial results for the second quarter of 2014, stating in pertinent part:

> ***AudioEye to Report Profitable Second Quarter on Record Revenue of* Approximately $3.0 Million**
>
> **Second Quarter Revenue Increases Approximately 200% vs. $1.0 Million in First Quarter Revenue**
>
> TUCSON, Arizona - July 2, 2014 - AudioEye®, Inc. (OTCQB: AEYE) ("AudioEye"), creator of the Audio Internet® patented audio browsing and automated publishing technology platform, today announced that the Company expects to report record operating results for the second quarter of 2014. The highlights of AudioEye's record-breaking quarter are reviewed below:

> • The Company expects to report approximately $3.0 million in recognizable revenue for the three months ended June 30, 2014. This compares with approximately $0.2 million in the prior-year quarter and represents an approximate 200% increase relative to revenue of $1.0 million in the quarter ended March 31, 2014.
>
> • The annualized revenue "run rate" for the most recent quarter approximated $12 million.
>
> • Revenue for the first half of 2014 and 2013 approximated $4.0 million and $0.4 million, respectively.
>
> • Management expects revenue to exceed the Company's previous guidance of $8 million for the year ending December 31, 2014.

77. The release also quoted Defendant Bradley as stating: "Revenue growth is an indicator that we are achieving our mission as a team. The Company is on pace to exceed our previous revenue guidance of $8 million for the full year . . . ."

78. The statements referenced above in ¶¶76-77 were each materially false and misleading because, *inter alia*, the revenue numbers set forth above were materially false, as the Company later admitted. Specifically, the Company did not expect to have $3.01 million in revenues in the second quarter of 2014, but only $51,320. Hence, Defendants' statements regarding the Company's anticipated revenues, revenue comparisons to prior quarters, "annualized revenue 'run rate,'" and revenue "guidance" were materially false.

79. On August 8, 2014, the Company filed a Prospectus on Form 424B3 with the SEC covering the sale by participants of a June 2014 private placement of shares of the Company's common stock from which the Company had received gross proceeds of $830,000. The Prospectus annexed the Company's financial statements for the first quarter of 2014 as an exhibit.

80. The financial statements annexed to the Prospectus referred to the foregoing paragraph were materially false and misleading for the reasons set forth above in ¶¶72, 75.

81. On August 11, 2014, Defendants filed the Company's 10-Q for the second quarter of 2014 with the SEC, reporting financial results similar to those indicated in the July 2, 2014 release. The report, which was signed by Defendants Bradley and O'Donnell, reported revenues of $3 million for the three months ended June 30, 2014, which included $2.9 million in revenues from thirteen nonmonetary licensing transactions. The report also made the same claims as the Company's first quarter 2014 report regarding the Company's compliance with GAAP and determination of fair value "within reasonable limits." The report stated in pertinent part:

> In transactions where the Company engages in a non-cash exchange of a license of the Company for the services of the Company's customer, the Company follows Accounting Standards Codification ("ASC") . . . ASC 985-845-10 [sic]. *The fair value of the technology or services exchanged or received is determined within reasonable limits* . . . .
>
> For the three . . . months ended June 30, 2014, the Company sold an aggregate of thirteen . . . licenses . . . for $225,000 per license and exchanged the license with its customers for either a license to their intellectual property or prepaid services. The thirteen . . . licenses exchanged [sic] were determined to meet the aforementioned criteria. During the three . . . months ended June 30, 2014, nonmmonetary revenue of $2,925,000 . . . was recognized.

82. Like the Company's prior quarterly report, as alleged above in ¶¶67-68, the report asserted that the financial statements constituted a "fair presentation" of the Company's financial position, and that the Company's had a policy of only recognizing revenue when there was a "fixed or determinable price . . . ."

83. The report additionally included statements regarding the effectiveness of the Company's internal controls for the quarter in question:

> Our management carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures. Based on that evaluation, our Principal Executive Officer and Principal Financial Officer have concluded that our disclosure controls and procedures were *effective* . . . in accordance with generally accepted accounting principles.

84. The report additionally included signed certifications by each of the Individual Defendants pursuant to SOX, containing the same attestations as set forth above in ¶¶69-71.

85. The statements referenced above in ¶¶81-84 were each materially false and misleading because, *inter alia*,

a. As Defendants would later admit, the fair values of the technology and products exchanged or received in the transactions were not "determinable within reasonable limits," and, hence, those transactions did not "meet" the GAAP criteria for recognizing revenue. Moreover, the Company recognized revenue in connection with the subject transactions despite the fact that there was no "fixed or determinable price . . . ."

b. The revenue numbers set forth above were materially false, as the Company later admitted. Specifically, the Company did not have $3.01 million in revenues in the second quarter of 2014, but only $51,320 because the nonmonetary licensing transactions did not generate $225,000 apiece in revenue, but, instead, zero dollars.

c. As Defendants would later admit, the financial statements were not "prepared in accordance with [GAAP]," did not comprise a "fair presentation" of the Company's financial position and results, and contained material misstatements in that they overstated the Company's revenues by $2.96 million and were required to be restated.

d. As Defendants would later admit, the Company's internal controls were "not effective," and resulted in material overstatements of the Company's revenues.

86. That same day, August 11, 2014, Defendants issued a press release regarding the Company's financial results for the second quarter of 2014, stating in pertinent part:

> **AudioEye, Inc. Reports Net Income of $1.0 Million on Revenue of $3.0 Million for Second Quarter of 2014**
>
> **Company Increases Revenue Guidance From $8 Million to $12 Million for Fiscal Year Ending December 31, 2014**
>
> TUCSON, AZ--(Marketwired - Aug 11, 2014) - AudioEye®, Inc. (OTCQB: AEYE) ("AudioEye"), creator of the Audio Internet® patented audio browsing and automated publishing technology platform, today announced its operating results for the second quarter and first half of 2014. . . .
>
> Revenue for the three months ended June 30, 2014 totaled $3,013,033, which represented a 1,405% increase when compared with revenue of $200,232 in the second quarter of 2013. On a sequential basis, revenue for the second quarter of 2014 increased 192% when compared with revenue of $1,032,886 in the first quarter of 2014.
>
> The Company's annualized revenue "run rate" in the second quarter of 2014 approximated $12 million.

87. The release also quoted Defendant Bradley as stating: "Based upon the Company's financial performance during the first half of 2014 . . . , we have increased our revenue guidance from $8 million previously to $12 million for the full year ending December 31, 2014."

88. The statements referenced above in ¶¶86-87 were each materially false and misleading because, *inter alia*, the revenue numbers set forth above were materially false, as the Company later admitted. Specifically, the Company did not have $3.01 million in revenues in the second quarter of 2014, but only $51,320. Accordingly, Defendants' statements regarding the Company's revenues, "annualized revenue "run rate," and comparisons to prior quarters were materially false.

89. On October 6, 2014, Defendants issued a preliminary release with respect to the Company's financial results for the third quarter of 2014, stating in pertinent part:

> **AudioEye to Report Profitable Third Quarter on Record Revenue of Approximately $4.7 Million**
>
> **Third Quarter Revenue Increases More Than 55% vs. $3.0 Million in Second Quarter Revenue**
>
> TUCSON, AZ--(Marketwired - Oct 6, 2014) - AudioEye®, Inc. (OTCQB: AEYE) ("AudioEye"), creator of the Audio Internet® patented audio browsing and automated publishing technology platform, today announced that the Company expects to report record operating results for the third quarter of 2014, which ended September 30, 2014. The highlights of AudioEye's), record-breaking quarter are reviewed below:
>
> • The Company expects to report approximately $4.7 million in revenue for the three months ended September 30, 2014. This compares with approximately $0.4 million in the prior-year quarter and represents an increase of more than 55% relative to revenue of approximately $3.0 million in the quarter ended June 30, 2014.
>
> • The annualized revenue "run rate" for the most recent quarter approximated $19 million.
>
> • Revenue for the first nine months of 2014 and 2013 approximated $8.7 million and $0.8 million, respectively.
>
> • Management expects revenue to exceed the Company's previous guidance of $12 million for the year ending December 31, 2014.
>
> * * *
>
> • Cross-license related revenue in the most recent quarter amounted to approximately $4.1 million . . . .

90. The statements referenced above in ¶89 were each materially false and misleading because, *inter alia*,

a. The revenue numbers set forth above were materially false, as the Company later admitted. Specifically, the Company did not expect $4.8 million in revenues in the third quarter of 2014, but only $187,766. Hence, Defendants' statements regarding revenues, comparisons to prior quarters, and "annualized revenue 'run rate'" were materially false.

b. The Company had no "cross-license related revenues" for the reasons set forth above in ¶¶53-65.

91. On November 7, 2014, Defendants filed the Company's 10-Q for the third quarter of 2014 with the SEC, reporting financial results consistent with those indicated in the October 6, 2014 release. The report, which was signed by Defendants Bradley and O'Donnell, reported revenues of $4.8 million for the three months ended September 30, 2014, including $4.2 million in revenues from nineteen nonmonetary licensing transactions. As in the two prior quarters, the report also stated that the Company complied with GAAP and that fair value was determined "within reasonable limits":

> In transactions where the Company engages in a non-cash exchange of a license of the Company for the services of the Company's customer, the Company follows . . . ASC 985-845-10. *The fair value of the technology or services exchanged or received is determined within reasonable limits* . . . .
>
> For the three . . . months ended September 30, 2014, the Company sold an aggregate of nineteen . . . licenses . . . with a fair value of $225,000 per license, in exchange for either a license to their intellectual property or prepaid services. The licenses exchanged were determined to meet the aforementioned criteria. During the three and nine months ended September 30, 2014, nonmonetary revenue of $4,275,000 . . . was recognized.

92. Like the Company's two prior quarterly reports, as alleged above in ¶¶67-68 and ¶82, the report asserted that the financial statements constituted a "fair presentation" of the Company's financial position, and that the Company's had a policy of only recognizing revenue when there was a "fixed or determinable price . . . ."

93. The report additionally included statements regarding the effectiveness of the Company's internal controls which were identical to those set forth by the Company in its prior quarterly report as set forth above in ¶83.

94. The report additionally included signed certifications by each of the Individual Defendants pursuant to SOX, containing the same attestations as set forth above in ¶¶69-71.

95. The statements referenced above in ¶¶91-94 were each materially false and misleading because, *inter alia*,

a. As Defendants would later admit, the fair values of the technology and products exchanged or received in the transactions were not "determinable within reasonable limits," and, hence, those transactions did not "meet" the GAAP criteria for recognizing revenue. Moreover, the Company recognized revenue in connection with the subject transactions despite the fact that there was no "fixed or determinable price . . . ."

b. The revenue numbers set forth above were materially false, as the Company later admitted. Specifically, the Company did not have $4.8 million in revenues in the third quarter of 2014, but only $187,766 because the nonmonetary licensing transactions did not generate $225,000 apiece in revenue, but, instead, zero dollars.

c. As Defendants would later admit, the financial statements were not "prepared in accordance with [GAAP]," did not comprise a "fair presentation" of the Company's financial position and results, and contained material misstatements in that they overstated the Company's revenues by $4.6 million and were required to be restated.

d. As Defendants would later admit, the Company's internal controls were "not effective," and resulted in material overstatements of the Company's revenues.

96. On November 10, 2014, Defendants issued a press release regarding the Company's 2014 financial results to date, stating in pertinent part:

> **Revenue of $8.8 Million and Net Income of $0.9 Million Recorded in First Nine Months of 2014**
>
> TUCSON, AZ--(Marketwired - Nov 10, 2014) - AudioEye®, Inc. (OTCQB: AEYE) ("AudioEye") (the "Company"), creator of the Audio Internet® patented audio browsing and automated publishing technology

> platform, today announced its operating results for the third quarter and first nine months of 2014. . . .
>
> Revenue for the three months ended September 30, 2014 totaled $4,837,411, which represented a 1,168% increase when compared with revenue of $381,539 in the third quarter of 2013. On a sequential basis, revenue for the third quarter of 2014 increased 61% when compared with revenue of $3,013,033 in the second quarter of 2014.
>
> The Company's annualized revenue "run rate" in the third quarter of 2014 approximated $19.3 million.
>
> *   *   *
>
> On a sequential basis, intellectual property ("IP") licensing revenue totaled $4,275,000 in the third quarter of 2014, for an increase of 46% when compared with IP revenue of $2,925,000 in the second quarter of 2014.

97. The statements referenced above in ¶96 were each materially false and misleading because, *inter alia*, the revenue numbers set forth above were materially false, as the Company later admitted. Specifically, the Company did not have $4.8 million in revenues in the third quarter of 2014, but only $187,766. Accordingly, Defendants' statements regarding the Company's revenues, comparisons to prior quarters, and "annualized revenue 'run rate'" were materially false.

98. On November 13, 2014, the Company filed a Form S-8 Registration Statement covering five million shares of the Company's stock issuable under the Company's 2015 Incentive Compensation Plan, incorporating by reference the Company's quarterly reports for the first, second, and third quarters of 2014.

99. The financial statements annexed to the Registration Statement referred to the foregoing paragraph were materially false and misleading for the reasons set forth above in ¶¶53-65, 72, 85, 95.

100. On December 15, 2014, Defendants filed on EDGAR their response to the SEC's letter of December 3, 2014 (*see* ¶45 above). The response, signed by Defendant O'Donnell, stated that the Company utilized fair value to account for the nonmonetary

licensing transactions because, *inter alia*, "[t]he fair value of the technology or services exchanged or received is determined within reasonable limits . . . ."

101. The statement referenced in the foregoing paragraph was each materially false and misleading because, *inter alia*, the fair values of the technology and products exchanged or received in the transactions were not "determinable within reasonable limits," and, hence, GAAP prohibited the use of those values for revenue recognition.

102. On February 6, 2015, the Company filed on EDGAR their response to the SEC's letter of January 16, 2015 (*see* ¶48 above), further purporting to explain the Company's fair value determinations. The response, signed by Defendant O'Donnell, stated in pertinent part:

> The prices for each transaction are fixed at the time of the agreement. In the case of the Company's nonmonetary transactions . . . , *the price is defined in terms of, for example, number of hours of consulting or other services to be provided by the counter-parties, priced at those entities' standard billing rates* for similar services provided to third-party customers they have, none of which involve the Company, and all of which are substantive and in the normal course of business that these Company customers conduct with their respective customers.

103. The response also set forth specific examples of the nonmonetary arrangements:

> Customer 3 . . . will provide introductions to prospective new Company customers for a base fee of $225,000, with a promise of performing 45 of such introductions over the course of a year from the inception of the arrangement, with the per introduction fee being *substantially similar to that charged to Customer 3's unrelated customers*.
>
> * * *
>
> In the second and third quarters of 2014, additional license and services non-monetary transactions were booked to the following customers:
>
> Using the value the Company previously established for the licensing of its patents, the Company provided a patent license to Customer 8 for website and other development services at Customer 8's standard client rate of $125 per hour for 1,800 hours in total, for a total value of $225,000. *Other clients of this service provider have paid $125 per hour in cash for the*

> *same or similar services, thus supporting the Company's assertions on fair value. . . .*
>
> The Company provided a patent license to Customer 9 for consulting, geographic and location setup services . . . at Customer 9's standard client rate of $200 per hour for 1,125 hours in total, for a total value of $225,000. *Other clients of this service provider have paid $200 per hour in cash, supporting the Company's assertions on fair value. . . .*
>
> In the other service transactions with service providers through September 30, 2014, services from each are received for $225,000, *which would be the same price associated with services provided by each to a third party. . . .*

104. The statements referenced above in ¶¶102-03 were each materially false and misleading because, *inter alia*, the Company had no evidence or backup documentation supporting the supposed "rates" and "prices" cited, and no such evidence or documentation existed. Rather, the values simply had been contrived by the Company and its counterparties for purposes of reporting inflated revenues.

105. The fact that the Company issued restatements was itself an admission that those financial statements as originally issued were false and not consistent with GAAP, and, additionally, that the overstatements of revenue were material.

106. As alleged above, GAAP consists of a hierarchy of authoritative literature promulgated by FASB the AICPA. The highest authority is the Accounting Standards Codification, or ASC.

107. The ASC Glossary defines a restatement as "[t]he process of revising previously issued financial statements to reflect the correction of an error in those financial statements." Glossary, ASC 250-10-20. Under GAAP, a restatement is necessary when "[a]n error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or *misuse of facts that existed at the time the financial statements were prepared*." Glossary, ASC 250-10-20.

108. Accordingly, by issuing the restatements, the Company admitted that the original financial statements were not issued in compliance with GAAP and contained materially false statements.

109. Moreover, the admitted reason for the restatements – *i.e.*, the complete "absence of documentation to support [the] transactions" upon which the Company's purported fair value determinations were based, including a "failure to trace the delivery of services" –existed at the time the erroneous financial statements were prepared.

## VI. LOSS CAUSATION

110. As detailed throughout and further herein, Defendants' fraudulent scheme artificially inflated AudioEye's stock price by overstating the Company's revenues during the Class Period. Defendants' false and misleading statements and omissions, individually and collectively, concealed the true business prospects of the Company, resulting in AudioEye's stock being artificially inflated until, as indicated herein, the truth about the lack of support for purported revenues associated with the nonmonetary license transactions was revealed. While each of these misrepresentations and omissions was independently fraudulent, they were all motivated by Defendants' desire to artificially inflate AudioEye's stock price and the image of its future business prospects to give the market the false notion that revenue growth was accelerating. These false and misleading statements and omissions, among others, had the intended effect of preventing the market from learning the full truth and keeping the Company's stock price artificially inflated throughout the Class Period.

111. Defendants' false and misleading statements and omissions had the intended effect and caused, or were a substantial contributing cause of, AudioEye's stock trading at artificially inflated levels during the Class Period, reaching as high as $1.18 per share on July 22, 2014.

112. The truth was revealed on April 1, 2015, when, as alleged above, the Company issued a press release announcing that (i) investors should no longer rely on the Company's financial statements for the first three quarters of 2014; (ii) the Company anticipated restating those quarters' financial statements to remove all $8.1 million of revenue associated with the nonmonetary licensing transactions; (iii) defendant O'Donnell had resigned as CFO of the Company as of March 29, 2015; and (iv) the Company expected to report "material weaknesses" in the Company's internal controls.

113. As a result of the Company's April 1, 2015, revelations, AudioEye's stock price plummeted 26% on unusually heavy trading volume, falling from a close of 41 cents per share on March 31, 2015, to a close of 30.5 cents per share on April 1, 2015, causing millions of dollars in investor losses. In the days that followed, AudioEye stock continued to decline, sinking to less than 10 cents per share on April 21, 2015.

114. The market's negative reaction to AudioEye's April 1, 2015 revelations is demonstrated by the following chart:



115. The rapid decline in AudioEye's stock price was the direct result of the nature and extent of the revelations made to investors and the market regarding the necessity for the $8.1 million in restatements, which had been concealed or misrepresented by Defendants' scheme and misstatements during the Class Period.

116. The timing and magnitude of AudioEye's stock price decline from March 31, 2015 through April 1, 2015 negates any inference that the losses suffered by Plaintiffs were caused by changed market conditions, macroeconomic or industry factors, or by Company-specific facts unrelated to Defendants' fraudulent conduct. This point is evidenced by the chart below, which demonstrates the clear divergence of AudioEye's stock price from the NASDAQ US Small Cap Software & Computer Services Index, which is comprised of peer companies, as the revelation of the truth became known to the market:




117. AudioEye's stock price plunged significantly in relation to the NASDAQ US Small Cap Software & Computer Services Index. This decline in stock price following the Company's April 1, 2015 disclosures was the direct result of the nature and extent of the revelations made to investors and the market regarding the required

financial restatements and the removal of the $8.1 million in revenue, and their resulting financial impact, which had been concealed or misrepresented by Defendants' scheme and misstatements during the Class Period. Thus, the revelations of truth, as well as the resulting clear market reactions, indicate that the market understood that Defendants' prior statements were false and misleading. In short, as the truth about Defendants' prior misrepresentations and concealments were revealed, the Company's stock price quickly sank, the artificial inflation came out of the stock, and Plaintiffs were damaged, suffering economic losses.

118. Accordingly, the economic loss suffered by Plaintiffs on April 1, 2015 was a direct and proximate result of Defendants' scheme and misrepresentations and omissions that artificially inflated the price of AudioEye's stock during the Class Period, and the subsequent significant decline in the value of AudioEye's stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the marketplace.

## VII. ADDITIONAL *SCIENTER* ALLEGATIONS

119. At all times during the Class Period Defendants acted with *scienter* in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, and knowingly or recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

120. Numerous factors, considered collectively, raise a compelling inference that Defendants' misstatements and omissions were intentional or deliberately reckless, including, inter alia, the following:

**A. The Magnitude of the Restatements and the Simplicity of the Accounting Principles Violated**

121. As alleged in detail above, the restatements were not the result of a few transactions or mistakes during a single quarter. The Company restated three quarters of financial statements to correct its accounting for thirty-six independent transactions. The restatements erased 100% of the aggregate $8.1 million in revenues that the Company had reported for those transactions.

122. Furthermore, the revenues associated with the nonmonetary licensing transactions were highly material, comprising virtually all of the Company's reported revenues in the first three quarters of 2014, as alleged above in ¶¶66, 81, 91. In the aggregate, the $8.1 million in revenues from the nonmonetary licensing transactions for the first three quarters of 2014 constituted 92% of the Company's total $8.9 million in revenues reported for those quarters. Put differently, Defendants overstated the Company's revenues during the Class Period by more than 3,000%.

123. The restatements also had a colossal impact on the Company's gross profits and operating income. Defendants had reported $7.4 million in gross profits, and $914,830 in operating income, for the nine months ended September 30, 2014. Under the restatements, gross profits were reduced by $7.8 million to become a gross *loss* of -$355,185. Similarly, operating income was reduced by $7.4 million to become an operating *loss* of -$6.5 million.

124. The restatements also had a dramatic impact on the Company's balance sheet. The Company's balance sheet had reflected prepaid assets of $5.2 million and total assets of $14 million as of September 30, 2014. The restatement reduced prepaid assets *97%* to only $167,873, and slashed total assets by *more than half* to only $6.8 million.

125. Accordingly, the magnitude of Defendants' false accounting in this case was enormous. Defendants' fraudulent accounting practices literally transformed the

entire financial condition of the Company, misled investors about the success of its business, and masked significant losses and the weakness in the Company's balance sheet.

126. Furthermore, the accounting principles violated by Defendants were simple and straightforward. As alleged above, ASC 845-10-30-3 permitted Defendants to account for the nonmonetary licensing transactions using fair value provided that fair value was "determinable within reasonable limits."

127. As Defendants admitted after the conclusion of the Class Period, however, there was a complete "absence of documentation to support [the] transactions" upon which the Company's purported fair value measurements were based. The Company had not observed any prices generated by market transactions to ascribe fair value. Instead, the Company and its counterparties apparently contrived the numbers out of thin air to report inflated revenues. Hence, fair value was not "determinable within reasonable limits," and GAAP required the transactions to be recorded at the book values of the Company's own licenses, which were zero.

128. Furthermore, the fact that the restatements erased 100% of the Company's revenues from the nonmonetary licensing transactions confirms that Defendants booked those revenues despite the fact that they never received *any* backup or support for the supposed fair value measurements. Were the case otherwise, the Company would only have needed to restate revenue from some of those transactions or only a portion of revenues from certain transactions.

129. Accordingly, the accounting violations in this case did not arise from mathematical errors or honest misapplications of standards or oversight, but, deliberate booking of revenue based on fair values without *any* factual support.

130. Under the circumstances, given the size and nature of the restatements, the pervasiveness and repetitiveness of the fraudulent accounting, and the simplicity of the accounting principles violated, a compelling inference of *scienter* is raised.

**B. Defendant O'Donnell's Role in Responding to the SEC, His Resignation, and the Claw-Back of His Incentive Compensation**

131. As alleged above, the SEC issued letters to the Company on December 3, 2014 and January 16, 2015 questioning the Company's accounting of the nonmonetary licensing transactions. Notably, the SEC specifically addressed those letters to Defendant O'Donnell, as CFO.

132. Furthermore, Defendant O'Donnell personally prepared the Company's responses to the SEC dated December 15, 2014 and February 6, 2015, which contained the misrepresentations and omissions alleged above in ¶¶100-03. This is indicated by the fact that Defendant O'Donnell not only signed each response on behalf of the Company, but also concluded each by stating: "If there are any questions regarding the responses included herein, please call me at 917-819-6990 or email me at todonnell@audioeye.com."

133. The responses to the SEC also evinced a high degree of familiarity with the nonmonetary licensing transactions. They comprised an aggregate of *twenty-six* single spaced pages of purported explanation about the Company's accounting therefor.

134. Additionally, as alleged above, Defendant O'Donnell resigned from his position as CFO of the Company as of March 29, 2015 — two days before the Company issued its April 1, 2015 release announcing the forthcoming restatements. Notably, that release also disclosed Defendant O'Donnell's resignation.

135. These circumstances raise a compelling inference that Defendant O'Donnell, the *scienter* of whom as a member of senior management is imputed to the Company, was directly involved with the accounting for the nonmonetary licensing

transactions, had detailed, first-hand knowledge of the facts pertaining to those transactions, and personally affected the fraudulent booking of revenues. Defendant O'Donnell's abrupt resignation from the Company is otherwise unexplained. There is no question that O'Donnell's departure was related to, and prompted by, the restatements. Furthermore, Defendant O'Donnell undertook the affirmative obligation to obtain knowledge in order to ensure the Company's disclosures to the market were truthful by executing SOX certifications, as alleged above in ¶¶69-71, 84, 94.

136. This compelling inference of *scienter* on the part of Defendant O'Donnell is bolstered by the fact that, upon his resignation, the Company clawed back from him millions of dollars in previously awarded incentive compensation pursuant to his Employment Agreement with the Company dated August 7, 2013. Under that agreement, the Company was entitled to claw back any and all incentive compensation granted to Defendant O'Donnell in the event of any "restatement . . . of any financial results . . . resulting from material non-compliance of the Company with any financial reporting requirement under the federal securities laws . . . ."

137. Pursuant to such provision, under Defendant O'Donnell's Separation Agreement with the Company, effective March 28, 2015, the Company compelled Defendant O'Donnell to surrender back to the Company (i) warrants to purchase Company stock issued on September 30, 2013; (ii) 150,000 Incentive Stock Options granted under the Company's 2012 Incentive Compensation Plan issued July 29, 2013; and (iii) 330,000 Incentive Stock Options granted under the Company's 2014 Incentive Compensation Plan issued March 24, 2014.

138. The Company's clawback of incentive compensation from Defendant O'Donnell contributes to a compelling inference of *scienter* because it suggests that the Company sought to penalize Defendant O'Donnell for causing the Company's non-compliance with the federal securities laws.

**C. The Timing of the Restatement**

139. *Scienter* is also supported by the timing of the restatement — immediately after SEC demanded backup for the nonmonetary licensing transactions which Defendants did not have.

**D. The Company's Small Number of Employees**

140. The *scienter* of the Individual Defendants is additionally supported by the fact that, as disclosed in the Company's Form 10-K annual report for 2013, the Company had only 18 employees as of March 26, 2014. This raises a strong inference that the Individual Defendants, who were senior managers of the Company, were intimately familiar with all material aspects of the Company's operations and financial reporting. Furthermore, as alleged above in ¶¶131-38, the circumstances suggest that Defendant O'Donnell, as CFO, personally affected the fraudulent booking of revenues. Accordingly, this is *not* a case where a fraud occurred at a distant subsidiary or was committed by lower-level employees who did not report directly to senior management.

141. Furthermore, the transactions that generated the phantom revenue accounted for 92% of the Company's total reported revenues during the first three quarters of 2014. Additionally, the Individual Defendants held themselves out to the SEC and the public as having knowledge of the details of those transactions (*see* ¶¶8, 46, 48, 52, 71, 74, 77, 87, 102, 131-38, 140 above).

142. The foregoing supports the inference that the Individual Defendants and other senior executives of AudioEye were aware of the lack of support for the valuations of the technology and services received in the nonmonetary licensing transactions.

**E. Defendants Were Motivated to Continue to Attract Capital from Accredited and Institutional Investors**

143. At all times during the Class Period the Company had meager revenues and negative net income and profits, and depended on continued access to the capital

markets for liquidity. Notably, at the commencement of the Class Period, the Company reported cash assets of only $492,718.

144. Defendants seized upon the advantage of the Company's inflated stock price during the Class Period to raise $4.4 million in proceeds from accredited and institutional investors in four separate private placements of the Company's securities, and an additional $3.7 million in proceeds from holders of warrants on the Company's stock in two separate warrant exercise offers.

145. The private placements consisted of the following transactions:

a. On June 30, 2014, the Company sold 2,766,667 units to three accredited investors for gross proceeds of $830,000 in a private placement. The units consisted of 2,766,667 shares of common stock and warrants to purchase an additional 2,766,667 shares of common stock.

b. On September 30, 2014, the Company sold 700,000 units to two accredited investors for gross proceeds of $350,000 in a private placement. The units consisted of 700,000 shares of common stock and warrants to purchase an additional 175,000 shares of common stock.

c. On December 31, 2014, the Company sold an aggregate of 6,687,500 units to 11 accredited investors for gross proceeds of $2,675,000 in a private placement. The units consisted of 6,687,500 shares of common stock and warrants to purchase an additional 2,507,812 shares of common stock.

d. On January 15, 2015, the Company sold an additional 812,500 units under the December 2014 private placement to one institutional investor for gross proceeds of $325,000. Each unit consisted of one share of the Company's common stock and warrants to purchase ¼ of a share for every common share purchased.

146. The warrant exchange offers consisted of the following:

a. On July 2014, the Company offered holders of a series of warrants the opportunity to exercise their warrants for a 10% discount to the stated exercise price in exchange for their agreement to exercise their warrants in full and for cash on or before July 31, 2014. Under the warrant exercise offer, in July 2014 the Company issued 10,027,002 shares of common stock pursuant to exercise of warrants for gross proceeds of $3,632,801.

b. In December 2014, the Company offered holders of a series of warrants the opportunity to exercise their warrants for a 10% discount to the stated exercise price in exchange for their agreement to exercise their warrants in full and for cash on or before December 31, 2014. Under the warrant exercise offer, in December 2014 the Company issued 331,804 shares of common stock pursuant to exercise of warrants for gross proceeds of $119,449.

147. Without the capital raised by these transactions, the Company would have faced severe liquidity issues during the Class Period. Furthermore, without the artificial inflation of the Company's stock, the Company would have been unable to attract such capital investment. For example, the warrant exchange offers only made sense to the holders of the warrants because the Company's stock price was significantly higher than those warrants' strike prices.

148. Defendants were motivated artificially to inflate the value of AudioEye stock during the Class Period in order to consummate these private placements and warrant exchange offers, thereby raising much-needed capital for the Company.

## VIII. PLAINTIFFS' CLASS ACTION ALLEGATIONS

149. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who acquired the publicly traded common stock of AudioEye during the period from May 14, 2014 through April 1, 2015, and who were damaged thereby. Excluded from the

Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

150. Because AudioEye has tens of millions of shares of stock outstanding and because the Company's shares were actively traded on the OTC, members of the Class are so numerous that joinder of all members is impracticable. According to AudioEye's SEC filings, as of the close of the Class Period, AudioEye had approximately 55.5 million shares outstanding. While the exact number of Class members can only be determined by appropriate discovery, Plaintiffs believe that Class members number at least in the thousands and that they are geographically dispersed.

151. Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

152. Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel experienced and competent in class actions and securities litigation. Plaintiffs have no interests that are contrary to, or in conflict with, the members of the Class they seek to represent.

153. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

154. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

155. Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that

Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

a. whether Defendants violated the federal securities laws as alleged herein;

b. whether Defendants' publicly disseminated SEC filings, press releases and statements during the Class Period omitted and/or misrepresented material facts;

c. whether Defendants failed to convey material facts or to correct material facts previously disseminated;

d. whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

e. whether Defendants acted willfully, with knowledge or severe recklessness, in omitting and/or misrepresenting material facts;

f. whether the market prices of AudioEye's securities during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and,

g. whether the members of the Class have sustained damages as a result of the decline in value of AudioEye's stock when the truth was revealed and the artificial inflation came out, and, if so, what is the appropriate measure of damages.

**COUNT I**

**FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS**

156. Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein. This claim is asserted against all Defendants.

157. During the Class Period, AudioEye, the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, Plaintiffs, and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of AudioEye's publicly traded securities; and (iii) cause Plaintiffs and the other members of the Class to purchase AudioEye's publicly traded securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, AudioEye and the Individual Defendants, and each of them, took the actions set forth herein.

158. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Company's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued as controlling persons of AudioEye, as alleged below.

159. In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, sales, financial condition, and operational performance so that

the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.

160. AudioEye and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about AudioEye's operations and the Company's growth prospects, as specified herein.

161. These Defendants each employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of AudioEye's value, performance and continued substantial sales and financial growth, which included the making of, or the participation in the making of, untrue statements of material facts about the noncash licensing transactions and omitting to state material facts necessary in order to make the statements made about the noncash licensing transactions not misleading in light of the circumstances under which they were made, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of AudioEye's securities during the Class Period.

162. The Individual Defendants' primary liability and controlling person liability arise from the following facts, among others: (i) the Individual Defendants were high-level executives at the Company during the Class Period; (ii) the Individual Defendants, by virtue of their responsibilities and activities as senior executive officers, were privy to, and participated in, the creation, development, and reporting of the Company's sales, marketing, projections, and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with, were advised of, and had access to other members of the Company's management team, internal reports, and

other data and information about the noncash licensing transactions at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

163. Each of the Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severely reckless disregard for the truth, in that each failed to ascertain and disclose such facts, even though such facts were available to each of them. Such Defendants' material misrepresentations and/or omissions were done knowingly or with deliberate recklessness and for the purpose and effect of concealing information regarding AudioEye from the investing public and supporting the artificially inflated price of its securities. As demonstrated by the Individual Defendants' misstatements and omissions throughout the Class Period regarding the noncash licensing transactions, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

164. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of AudioEye's securities were artificially inflated during the Class Period. In ignorance of the fact that market prices of AudioEye's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or disregarded with deliberate recklessness by, Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class

acquired AudioEye's securities during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the stock price declines above.

165. At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known of AudioEye's fraudulent practices, the true nature of the noncash licensing transactions, or AudioEye's true intrinsic value, which were not disclosed by Defendants, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired their AudioEye publicly traded securities during the Class Period; or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

166. By virtue of the foregoing, AudioEye and the Individual Defendants have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

167. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from AudioEye's stock.

**COUNT II**

**FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS**

168. Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein. This claim is asserted against the Individual Defendants.

169. The Individual Defendants acted as controlling persons of AudioEye within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue

of their high level positions with the Company, participation in, and/or awareness of, the Company's operations, and/or intimate knowledge of the Company's fraudulent practices and the Company's actual results and future prospects, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

170. In addition, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

171. As set forth above, AudioEye and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from AudioEye's stock.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for relief and judgment, as follows:

A. Declaring that this action is a proper class action and certifying Plaintiffs as class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel for the proposed Class;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Such other and further relief as the Court deems appropriate.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: November 30, 2015

Respectfully submitted,

KIRBY McINERNEY LLP

By: /s/ *Mark A. Strauss*
Ira M. Press (*pro hac vice*)
ipress@kmllp.com
Mark A. Strauss (*pro hac vice*)
Mstrauss@kmllp.com
825 Third Avenue, 16th Floor
New York, NY 10022
Tel: (212) 371-6600
Fax: (212) 751-2540

*Lead Counsel for Lead Plaintiffs*

BONNETT FAIRBOURN FRIEDMAN & BALINT, P.C.
Andrew S. Friedman (AZ005425)
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Tel: (602) 274-1100
Fax: (602) 274-1199
afriedman@bffb.com

*Liaison Counsel for Lead Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 30 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 30, 2015.

By: /s/ *Mark A. Strauss*
Ira M. Press (*pro hac vice*)
ipress@kmllp.com
Mark A. Strauss (*pro hac vice*)
Mstrauss@kmllp.com
825 Third Avenue, 16th Floor
New York, NY 10022

*Lead Counsel for Lead Plaintiffs*