LAW OFFICES OF A BATES BUTLER III LLC
A Bates Butler III (AZ002417)
bates@abbutlerlaw.com
177 N Church Ave., Ste. 1013
Tucson, AZ 85701
Tel: 520-624-6200
Fax: (520) 624-6204

SICHENZIA ROSS FRIEDMAN FERENCE LLP
Mendy Piekarski (*pro hac vice*)
61 Broadway, 32nd Floor
New York, NY 10006
Tell: (212) 930-9700
Fax: (212) 930-9725
mpiekarski@srff.com

*Counsel for Defendant Edward O'Donnell*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

|  |  |
|---|---|
| *In re AudioEye, Inc. Sec. Litig.*, | CV-15-163-TUC-DCB (LEAD) |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT EDWARD O'DONNELL'S MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

**TABLE OF AUTHORITIES** ..................................................................................iii

**PRELIMINARY STATEMENT**……………………………………………………1

**STATEMENT OF FACTS**……………………………………………………………3

**ARGUMENT** ...................................................................................................15

I.   PLATINFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b) AND
     RULE 10b……………………...…….......................................................16

     A.    Plaintiffs Fail to Allege Any Facts Giving Rise To A Strong Inference of
           O'Donnell's Scienter.  ........................................................... 16

           1.   Restating Financial Statements Does Not Give Raise To A Strong
                Inference Of Scienter ............................................... 17

           2.   The More "Compelling" Inference Is That O'Donnell Acted
                Appropriately Upon Advice From The Company's Auditor and an
                Outside Accounting Firm For A Reasonable Interpretation of GAAP......26

     B.    The Complaint Includes Alleged Misstatements That Are  Contradicted By The
           Company's Public Filings Referenced In The Complaint ....................................27

II.  PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 20(a) ..........................29

**CONCLUSION** ...........................................................................................29

1

2

## <u>TABLE OF AUTHORITIES</u>

3

**Page(s)**

CASES

*Ashcroft v. Iqbal,*
    56 U.S. 662 (2009) ............................................................................................14

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ...........................................................................................14

*Broderick v. PricewaterhouseCoopers LLP,*
    169 F. App'x 496 (9th Cir. 2006) .....................................................................22

*Cali v. Rosenberg,*
    45 F.3d 435 (9th Cir. 1994) ..............................................................................29

*DSAM Global Value Fund v. Altris Software, Inc.,*
    288 F.3d 385 (9th Cir. 2002) ..................................................................18, 19, 20

*Dura Pharm., Inc. v. Broudo.,*
    544 U.S. 336 (2005) ..........................................................................................8, 9

*Glazer Capital Mgmt., LP v. Magistri,*
    49 F.3d 736 (9th Cir. 2008) ..............................................................................23

*Hemmer Grp. v. SouthWest Water Co.,*
    527 F. App'x 623 (9th Cir. 2013) ..................................................................9, 11

*In re Yahoo! Inc. Sec. Litig.,*
    611 F. App'x 387, (9th Cir. 2015) ....................................................................29

*In Touch Concepts, Inc. v. Cellco P'ship,*
    949 F. Supp. 2d 447 (S.D.N.Y. 2013) ..............................................................22

*Lazy Y Ranch Ltd. v. Behrens,*
    546 F.3d 580 (9th Cir. 2008) ............................................................................27

*Lipton v. Pathogenesis Corp.,*
    284 F.3d 1027, 1038 (9th Cir. 2002) ................................................................25

*Medicis Pharm. Corp. Sec. Litig.,*
    689 F. Supp. 2d 1192 (D. Ariz. 2009) ...............................2, 17, 18, 19, 20, 22, 24

*Shalala v. Guernsey Mem'l Hosp.,*
    14 U.S. 87 (1995) ..............................................................................................23

*Software Toolworks, Inc. Sec. Litig.*,
  50 F.3d 615 (9th Cir. 1994) ...................................................................................19

*Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*,
  633 F. Supp. 2d 763 (D. Ariz. 2009) .....................................................................21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).............................................................................2, 4, 16, 17, 26

*Thor Power Tool Co. v. Comm'r*,
  439 U.S. 522 (1979)..........................................................................................17, 18

*Weiss v. Amkor Tech., Inc.*,
  527 F. Supp. 2d 938 (D. Ariz. 2007) .....................................................................17

*Yourish v. Cal. Amplifier*,
  191 F.3d 983 (9th Cir. 1999) .................................................................................22

*Zucco Partners, LLC v. Digimarc Corp.*
  552 F.3d 981 (9th Cir. 2009) ........................................2, 16, 18, 21, 22, 23, 25, 26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defendant Edward O'Donnell respectfully submits this Memorandum of Law in support of his motion to dismiss the Amended Complaint (the "Complaint") filed by Lead Plaintiffs Globis Capital Partners, L.P. and Globis Overseas Fund, Ltd. (collectively, "Plaintiffs") under F.R.C.P Rules 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b) (the "PSLRA").

## PRELIMINARY STATEMENT

Plaintiffs allege that defendant AudioEye, Inc.'s (the "Company") voluntary restatement of its financial reports regarding revenue derived from certain noncash transactions (the "Non-Cash Transactions") was part of a fraudulent scheme to artificially inflate the Company's stock price. The Complaint's allegations of scienter, however, are not pled with the particularity required to survive dismissal under Rules 12(b)(6) and 9(b) and the PSLRA.

At issue is the Company's accounting treatment of its Non-Cash Transactions, in which the Company exchanged its proprietary technologies for licenses and/or services from various strategic vendors. In accordance with its understanding of GAAP, and based on consultations with its auditor and an outside accounting firm, the Company recognized revenue from these Non-Cash Transactions in amounts based on the standard market prices of the licenses and/or services it received from the vendors as articulated more fully below.

The Complaint's principal allegation that purportedly supports the "strong inference" that O'Donnell acted with "intent to defraud" or "deliberate recklessness"—the pleading standard under the PSLRA and established Ninth Circuit precedent—is merely the fact that the Company voluntarily restated its financials. The Complaint does not support scienter with any statement by O'Donnell reflecting an intention to defraud or deliberate recklessness nor with

any confidential witnesses that may support the same.   Rather, the Complaint almost exclusively relies on the mere fact of the Company's restatement.

The law in this circuit is clear, however, that "***the mere publication of a restatement is not enough to create a strong inference of scienter***." <u>Zucco Partners, LLC v. Digimarc Corp.</u>, 552 F.3d 981, 1000 (9th Cir. 2009), <u>as amended</u> (Feb. 10, 2009) (emphasis added).  This is so, "***even if the GAAP violations are significant or require large or multiple restatements***." <u>In re Medicis Pharm. Corp. Sec. Litig.</u>, 689 F. Supp. 2d 1192, 1203 (D. Ariz. 2009) (internal quotations omitted and emphasis added).  Accordingly, as a matter of law, the Complaint's allegations regarding the Company's restatement of its financials simply fail to raise a strong inference of scienter.

The United States Supreme Court has ruled that a complaint will survive only if the inference of scienter is "at least as compelling as any opposing inference [of nonfraudulent intent] one could draw from the facts alleged." <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 324 (2007).  The most compelling and cogent inference based on the facts alleged in the Complaint, and included in the Company's public filings referenced in the Complaint, is that the Company's restatement was, at most, the result of negligence and not the result of O'Donnell's intention to fabricate the accounting misstatements.

The inference of non-fraudulent intent is more compelling and cogent than the inference of fraudulent intent because, in the first instance, O'Donnell consulted with the Company's auditors and another outside accounting firm on how to comply with GAAP in accounting for its Non-Cash Transactions.  Based on this outside advice, it was determined that, under GAAP, it was proper for the Company to recognize revenues from the Non-Cash Transaction, and based on the value of the assets and or services the Company received.  Further, in each of the

financial statements at issue in the Complaint, the Company clearly articulated the GAAP principles upon which the Company relied as well as the non-cash nature of the transactions. Finally, when the U.S. Securities and Exchange Commission's ("SEC") Division of Corporate Finance contacted the Company seeking clarification of its accounting methodology. Defendants—consistent with their belief that they had relied upon an appropriate, even if somewhat aggressive, interpretation of the relevant GAAP guidelines—sought, over the course of several lengthy correspondences, to explain in great detail the Company's accounting methodology and GAAP reliance. These facts are all consistent only with an inference that O'Donnell did not act with "intent to defraud" or "deliberate recklessness."

Ultimately, upon undertaking an internal review of its accounting procedures, the Company determined to restate its financial reports solely because it was unable to gather sufficient independent corroboration of certain third-party prices. This error notwithstanding, it remains more compelling the Company was, at most, negligent in its failure to maintain proper internal accounting controls to ensure it procured all the necessary documentation rather than that it intentionally misapplied or ignored an obvious GAAP provision. Because the inference of scienter is not as compelling as the inference of negligence, the Court must dismiss the Complaint for failure to plead scienter with particularity.

## STATEMENT OF FACTS

### A. Plaintiffs

O'Donnell refers the Court to Paragraph 21 of the Complaint for a description of Plaintiffs and its securities transactions. Compl. ¶ 21.

**B. Defendants**

AudioEye Inc. (the "Company" or "AudioEye") is a Delaware corporation headquartered in Tucson, Arizona and trades on the OTCQB Venture Marketplace ("OTC") under the ticker symbol "AEYE."  Compl. ¶ 22.

Defendant Edward O'Donnell at all relevant times served as the Company's Chief Financial Officer ("CFO") until his resignation on March 29, 2015.  Compl. ¶ 24.

Defendant Nathaniel Bradley ("Bradley") has served as the Company's President and Chief Executive Officer ("CEO") at all relevant times.  Compl. ¶ 23.

**C. The Company's IP Assets**

The Company is a technology company focused on improving the usability and accessibility of internet-based content through the development, sale, and licensing of its proprietary technologies (the "Technologies" or "IP").  Compl. ¶ 22; see also Exhibit 1 to Declaration of Mendy Piekarski In Support ("Piekarski Decl.") at 5.[1]  The Company's Technologies enable visually impaired persons to navigate the internet through audio.  Id.  The Company derived revenues from two sources.  Exhibit 2 to Piekarski Decl. at 6.  First, the Company generated revenues from the sale of services and products—based on its Technologies—to corporate publishers, to consumer websites, and to governments.  Id.  Second, the Company generated revenue through entering licensing arrangements and noncash

---

[1] In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court may consider documents whose contents are alleged in the complaint.  See, e.g., Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994) overruled on other grounds by Galbraith v. Cty. of Santa Clara, 307 F.3d 1119 (9th Cir. 2002) quoting Romani v. Shearson Lehman Hutton, 929 F.2d 875, 879 n. 3 (1st Cir. 1991)) ("We hold that documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss. Such consideration does 'not convert the motion to dismiss into a motion for summary judgment.'").  A court may also take judicial notice of publically available documents.  See Tellabs, 551 U.S. at 322.

exchanges with vendors in various related markets—the Non-Cash Transactions at issue here. Exhibit 3 to Piekarski Decl., Appendix A at 1.

### D. **The Company's Non-Cash Transactions**

#### a. **Strategic Purpose of The Non-Cash Transactions**

The Company engaged in Non-Cash Transactions as a way to propel its growth.  Ex. 2 at 4, 8.  Viewing its business goals and opportunities more broadly than simply promoting its audio technology, the Company sought to expand into the related sectors of health and internet technology.  Id.  In pursuit of this strategy, the Company used its existing assets, such as its IP, in lieu of spending resources, to acquire technological and sales expertise in the markets it sought to enter.  Id. at 8.

Specifically, the Company engaged in Non-Cash Transactions in order to acquire IP licenses and/or services from various strategic vendors.  Id.   The counterparties to the Non-Cash Transactions (the "Counterparties")—to which the Company licensed its IP—typically developed products or provided services in the areas of assisted living, secure internet access and the behavioral management market, among others.  Ex. 3, Appendix A at 5.  Through the Non-Cash Transactions, the Company obtained licenses to the Counterparties' intellectual property, with the intention to employ that intellectual property in developing products or services to use in accessing new markets.  Ex. 3 at 4.  In those instances where the Company obtained services in exchange for its IP, the Company received services that included marketing consulting services, human resources consulting services, and website and software development services.  Ex. 2 at 8.

### b.  Preliminary Cash Transaction Before Non-Cash Transactions

The Non-Cash Transactions were preceded by an initial cash transaction, upon which the Company, at least in part, assessed the dollar value of its Technologies.  Ex. 3, Appendix B at 1.  Specifically, on March 7, 2014, the Company contracted with a vendor to provide sales introductions for the price of $5,000 per sales introduction (the "Preliminary Cash Transaction").  Id.  The vendor typically charged this rate to its other, third-party customers for approximately 15 years.  Id.  The Company agreed to pay $2,500 per introduction and an additional $2,500 upon successful execution of a partnering agreement for a total of $5,000.  Id.  Ultimately, the Company entered into three partnering agreements resulting from the vendor's introductions and, pursuant to the agreed-upon terms, paid the service provider $15,000.  Id.

### c.  Initial Non-Cash Transaction

Seeking to expand on the success of the Preliminary Cash Transaction, the Company and the vendor agreed to a subsequent transaction, in which the Company provided the vendor with a license to its Technologies in exchange for fifty sales introductions and a 12% royalty on sales or licenses of any products developed using the Technologies (the "Initial Non-Cash Transaction").  Id.  The parties valued this transaction at $225,000, calculated at the standard price of $5,000 per sales introduction, as normally charged by the vendor, less a 10% discount. Id.

### d.  Subsequent Non-Cash Transactions

Following on the success of the Initial Non-Cash Transaction, the Company engaged in numerous other Non-Cash Transactions throughout the remainder of 2014.  O'Donnell refers the Court to Paragraphs 3 and 41 of the Complaint for an enumeration of the Non-Cash Transactions.  See Compl. ¶¶ 3, 41.

### e.  Determination of Value of Non-Cash Transactions

The Company and the Counterparties determined the pricing and the value of Non-Cash Transactions based on the value of the Company's IP as well as based on the value of the license or service received from the Counterparties.  Ex. 3 at 4.  In December 2010, the Company engaged an unrelated appraiser to provide a fair market valuation of its patent holdings, including those patents that were later included in the Non-Cash Transactions.  Id. The appraiser determined that the net present value of the Company's royalties on revenues from two potential clients was in a range from $197,426.57 to $269,853.71.  Id.  Thus, the appraisal provided a general, objective valuation range for the IP.  Id.

Additionally, the Company and Counterparties determined the value of the license or service exchanged based on standard market prices.  Ex. 3, Appendix A at 3-6.  The Counterparties provided the licenses and services to the Company at the same rates they provided these licenses and services in the normal course of their business operations to other, unrelated customers.  Id. at 5.  For example, in many Non-Cash Transactions, the price of a Counterparty's service was determined by the number of hours of consulting or other service, priced at the Counterparty's standard billing rates for similar services provided to unrelated third party customers in the normal course of business.[2]  Id.  As such, the values of the license or service exchanged were based on standard market prices.  Id.

Thus, taken together, the value of the Non-Cash Transactions was based on, in the first instance, the outside appraised value of the IP, the Preliminary Cash Transaction, and, most

---

[2] Examples include the Company's second quarter 2014 transactions with Customer 1, which provided the Company with consulting services priced at $225 per hour, and with Customer 2, which provided consulting services at a flat rate of $18,750 per month.  Id.

importantly, the standard market rates of the licenses or services provided by the Counterparties.  See Ex. 3, Appendix A at 3-6; see also Appendix B at 1.

### E. Company Consults With Accounting Experts To Determine Appropriate GAAP Treatment of Non-Cash Transactions

Throughout 2014, the Company consulted with both its auditors and with an outside accounting firm to seek guidance on the appropriate accounting treatment for the Non-Cash Transactions.  See Exhibit 4 at 2; see also Ex. 1 at 5-6.  The auditor and outside accounting firm both advised the Company to apply the following GAAP principles in accounting for its Non-Cash Transactions: (1) Financial Accounting Standards Board's ("FASB") Accounting Standards Codification ("ASC") 605; (2) ASC 845-10-30-1; and (3) ASC 985.  Ex. 3, Appendix A at 1.

#### a. ASC 605

ASC 605 includes GAAP guidance on revenue recognition.  See ACS 605[3]; see also Ex. 3, Appendix A at 1.  Under ASC 605, the two primary conditions for revenue recognition are that: (a) the revenue was *realized* or *realizable*, and (b) it had been earned.  Id.  Revenue is considered realized or realizable when the seller receives an asset that is readily convertible into cash.  Id.  Nonmonetary assets that are not readily convertible into cash meet the realizability criterion as long as the fair values of such assets are "readily determinable."  Id.

Under ASC 605, revenue is deemed realized or realizable and earned when the following four conditions are met: (1) evidence of an arrangement; (2) delivery; (3) prices for each transaction are fixed; and (4) reasonable assurance of collectability.  See Ex. 3, Appendix A at 2.  The Company, in consultation with its outside accounting experts, concluded that its

---

[3] Available at https://asc.fasb.org.

Non-Cash Transactions met these four conditions[4] and, therefore, the Non-Cash Transactions resulted in revenue recognition for purposes of the Company's accounting under ASC 605.  Id. at 3.

### b.  ASC 845-10-30

Upon the advice of its outside accounting experts, the Company also relied on GAAP guidance ASC 845-10-30 in determining the appropriate accounting treatment of its Non-Cash Transactions.  See Ex. 3, Appendix A at 4-5.  ASC 845-10-30-1 provides that the accounting of nonmonetary transactions should be based on the fair values of the assets (or services) involved. Id.   Under ASC 845-10-30-1, if the value of the asset or services received is more clearly evident than the value of the asset surrendered, then the fair value of the asset or services received is required to be used in determining the value of the transaction.  Id.

The Company, in consultation with its outside accounting experts, applied ASC 845-10-30 to its Non-Cash Transactions and determined that the fair value of the asset or services it received from the Counterparties was more clearly evident than the fair value of the IP it surrendered because the former was supported by unrelated third-party transactions. Accordingly, the Company used the fair value of the asset or services received in accounting for the Non-Cash Transactions.  Id.

---

[4] Specifically, the Company concluded that: (1) evidence of an arrangement existed in the formal licensing agreements executed with each of the Counterparties (the "Licensing Agreements"); (2) delivery occurred when the Company provides its IP to the Counterparties, which effectively coincided with the execution of the respective Licensing Agreements; (3) the prices for each transaction were fixed at the time of the Licensing Agreements as the prices were defined in terms of the market rates of the Counterparties' licenses and services; and (4) reasonable assurance of collectability was demonstrated because the promised services had been or were being received by the Company.  Id.

ASC 845-10-30-3 also provides that nonmonetary exchanges may not be based on the values of the assets (or services) received if any of the following conditions exist: (1) the fair value of neither the assets or services received nor the assets or services surrendered "is determinable within reasonable limits;" (2) the exchange is of one product for another product to be sold in the same line of business; or (3) the transaction lacks commercial substance.  Id. Under ASC 845-10-30-4, a nonmonetary exchange has "commercial substance" if the entity's future cash flows are expected to significantly change as a result of the exchange.[5]  Id.

In consultation with its outside accounting experts, the Company determined that the three conditions of ASC 845-10-30-3 were not met.  Specifically: (1) fair value of the assets and services exchanged could be determined in the two ways articulated above (supra at 7); (2) the licenses and services obtained from the Counterparties were acquired for use in new markets or to new classes of customers; and (3) the Non-Cash Transactions did not lack commercial substance because the Company's configuration of cash flows was expected to change as a consequence of the Non-Cash Transactions.[6]  Id.

Thus, the Company, in consultation with its outside auditor and accounting experts, concluded ASC 845 required recognizing revenue for the Non-Cash Transactions based on the stated value of the licenses and services it received from the Counterparties.

---

[5]  The entity's future cash flows are expected to significantly change if the configuration (risk, timing, and amount) of the future cash flows of the assets received differs significantly from the configuration of the future cash flows of the assets transferred.  Id.

[6]  Specifically, the licenses the Company received would eventually produce cash inflows from incorporation into new products or services, and those cash flows would differ both in timing and amount from an immediate $225,000 cash license fee that the Company would otherwise obtain from a cash transaction.  See Ex. 3, Appendix A at 7.  Similarly, services the Company received though its Non-Cash Transactions also altered cash flows because otherwise the Company would have to incur cash outflows in future periods to acquire those services.  Id.

### c.  ASC 985

Finally, upon consultation with its outside accounting experts, the Company also relied on GAAP guidance ASC 985, which addresses revenue recognition in the software industry. See Ex. 3, Appendix A at 8-9.  Because the Company's IP was essentially software, the Company determined that ASC 985-605-25 was directly relevant in determining the accounting treatment of its Non-Cash Transactions.  Id.

ASC 985-605-25-3 provides that for certain software transactions, such as where a license to software is provided to a counterparty, revenue shall be recognized when the following criteria are met: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred; and (3) the vendor's fee is fixed or determinable; and (4) collectibility is probable.  Id. As mentioned, the Company had concluded that its Non-Cash Transactions met all of these four criteria.  Supra at 8.  Therefore, in reliance on ASC 985-605-25, the Company recognized revenue from its Non-Cash Transactions, based on the fair values of the licenses or services it received.  See Ex. 3, Appendix A at 8-9.

### F.  The Company Issues Financial Statements In Accordance With Accounting Advice and Clearly Indicating Non-Cash Nature of Transactions

In accordance with the above-mentioned analysis, the Company issued and filed financial statements for the first, second and third quarters of 2014 (the "Quarterly Reports").[7]

---

[7] Specifically, on May 14, 2015, the Company filed with the SEC its first quarter Form 10-Q ("Q1 10-Q") and issued a related press release.  Compl. ¶ 66; see also Exhibit 5 to Piekarski Decl.  The Q1 10-Q reflected revenues of $1.03 million for the three months ended March 31, 2014, including $900,000 from four licensing transactions, three of which constituted "noncash exchanges."  Id.  Moreover, the Q1 10-Q clearly articulated the GAAP principles upon which the Company relied on issuing the Q1 10-Q.  Id.  Similarly, on August 11, 2014, the Company filed with the SEC a 10-Q for the second quarter of 2014 ("Q2 10-Q"), reporting financial results similar to those indicated in the July 2, 2014 release.  Compl. ¶ 81.  The Q2 10-Q reported revenues of $3 million for the three months ended June 30, 2014, which included $2.9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Compl. ¶¶ 66, 81, 91.   The Quarterly Reports reflected revenues from the Non-Cash Transactions and, importantly, each of the Quarterly Reports clearly articulated the GAAP principles upon which the Company relied as well as the non-cash nature of the Non-Cash Transactions.  Id.

G. **The Company's Correspondence With SEC**

On December 3, 2014, the SEC's Division of Corporate Finance contacted the Company seeking clarification of the Company's accounting treatment of its Non-Cash Transactions as contained in its Quarterly Reports and related disclosures.   See Exhibit 6 to Piekarski Decl. Specifically, the SEC requested, *inter alia*, clarification of the types of licenses the Company exchanged in the Non-Cash Transactions, specific examples of Non-Cash Transactions, and how the Company determined fair value of the licenses involved in the Non-Cash Transactions. Id.

On December 15, 2014, the Company responded to the SEC's December 3 letter and addressed each and every question contained in the SEC's December 3 letter.  See Ex. 2.  The Company explained, *inter alia*, the nature of its IP and the licenses received in the Non-Cash Transactions, provided the SEC with several examples of Non-Cash Transactions, explained how the Company determined fair value of the licenses involved in the Non-Cash Transactions, and explained the GAAP rules and guidance it relied upon in filing its Quarterly Reports.  Id.

---

million in revenues from thirteen Non-Cash Transactions.  Id.  The Q2 10-Q clearly articulated the GAAP principles upon which the Company relied and expressly noted the non-cash nature of these transactions. Id. Finally, on November 7, 2014, the Company filed its third quarter 10-Q ("Q3 10-Q"), reporting revenues of $4.8 million, including $4.2 million in revenues from nineteen Non-Cash Transactions. Compl. ¶ 91. The Q3 10-Q clearly articulated the GAAP principles upon which the Company relied and expressly noted the non-cash nature of these transactions. Id.

---

On January 16, 2015, the SEC sent a second letter to the Company seeking further clarification of the Company's accounting treatment of the Non-Cash Transactions.  Exhibit 7 to Piekarski Decl.  The SEC requested additional clarification of the Company's reliance on ASC 985-845 (software), sought further explanation on how the Company determined the fair value of its IP given that it had not reported prior cash sales of its IP, and questioned whether IP licensing was part of the Company's core business.  Id.

On February 2, 2015, the Company responded to the SEC's January 16 letter, addressed each of the SEC's questions and included two Appendices to fully articulate its reasoning and GAAP guidance it relied upon.  See Ex. 3.  The Company explained that its IP provided in the Non-Cash Transactions was essentially software and, therefore, it looked to the relevant software accounting literature for guidance.  Id. at 2.  The Company explained that a prior cash transaction did take place—the Preliminary Cash Transaction—and that the price of the services received became the basis for the later Non-Cash Transactions, as discussed above.  Id. at 3 and Appendix B at 1; see also infra at 5-6.  Finally, the Company noted that, as expressly reflected in its various SEC filings, IP licensing had always been a significant part of the Company's business strategy, although it received less management attention in the Company's early years as the Company pursued other aspects of its business.  Id. at 5.

Despite the Company's clear articulation of its accounting methodology, the SEC persisted in questioning the Company's approach and, on March 12, 2015, the SEC sent a third letter to the Company seeking yet additional clarification of the Company's accounting treatment of the Non-Cash Transactions.  See Compl. ¶ 51.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### H.  <u>The Company's Restatement of its Financial Statements</u>

During the first quarter of 2015, leading up to the filing of its audited annual financial statement, the Company's Audit Committee commenced an internal review of its accounting controls including the accounting of its Non-Cash Transactions (the "Internal Review").  <u>See</u> Ex. 4.  The Company concluded that while the Company relied upon the correct GAAP principles in accounting for the Non-Cash Transactions, the Internal Review had identified certain errors in the <u>application</u> of those accounting principles.  <u>Id.</u>  In conjunction therewith, on March 26, 2015, the Company decided to restate its Quarterly Reports.  <u>Id.</u>

As the Company later explained in its restated Quarterly Reports, the basis for the restatement was a lack of adequate documentation supporting the value of the Counterparties' licenses or services.  <u>See</u> Ex. 1, pp. 5-6.  Upon conducting the Internal Review, the Company determined that it lacked sufficient independent corroboration of the prices of the Counterparties' licenses and/or services.  <u>See</u> Ex. 1 at 5-6.  That is, although the Counterparties communicated that the value of their licenses and/or services were directly based on prices charged to unrelated third-parties and provided their standard contracts with the unrelated third-parties in support, the Company ultimately deemed this insufficient because it did not have adequate independent support to establish that the Counterparties actually provided those services to the unrelated third parties per the terms of the Counterparties' contracts.  <u>Id.</u>

The Company also determined that the errors in collecting sufficient independent corroboration of the prices for the licenses and/or services were not intentional nor the result of reckless behavior; rather, they resulted from weakness in the Company's internal controls over financial reporting.  <u>Id.</u> at 6.  Nevertheless, in light of the insufficient documentation, the

Company decided to restate its financials and remove from its Quarterly Reports the noncash revenues derived from its Non-Cash Transactions.  Id.

## **ARGUMENT**

In deciding a motion to dismiss under Rule 12(b)(6), the Court must assume that well-pled factual allegations in the complaint are true.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The Court, however, does not accept legal conclusions, naked assertions, mere conclusory statements or implausible inferences.  Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009). A claim must raise more than the "mere possibility of misconduct"—a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id., at 678-79.  Here, considered together, the Complaint's allegations fail to satisfy the plausibility standard set forth in Twombly and Iqbal, much less the heightened pleading standards of Rule 9(b) and the PSLRA.

## I.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b) AND RULE 10b-5

To state a claim under Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b-5 promulgated thereunder, a plaintiff must allege: (i) a material misrepresentation or omission; (ii) with scienter; (iii) in connection with the purchase or sale of a security; (iv) reasonable reliance by the plaintiff on the representation or omission; (v) economic loss; and (vi) a loss proximately caused by the misrepresentation or omission.  See Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005).  As demonstrated below, the Complaint fails to plead scienter with the requisite particularity as to O'Donnell; accordingly, the Court must dismiss the Section 10(b) and Rule 10b-5 claims against him.

### A. Plaintiffs Fail To Allege Any Facts Giving Rise To A Strong Inference of O'Donnell's Scienter

To sufficiently plead a violation of Section 10(b) and Rule 10b-5, the PSLRA requires that, for each alleged misrepresentation and omission, a complaint must "state with particularity facts giving rise to a strong inference" of scienter for each defendant.  15 U.S.C. § 78u-4(b)(2). When a complaint fails to do so, "the court shall, on the motion of any defendant, dismiss the complaint."  15 U.S.C. § 78u-4(b)(3)(A).

In <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, the Supreme Court clarified the meaning of a "strong inference" of scienter under the PSLRA.  "To qualify as 'strong,'" the inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  551 U.S. 308, 314 (2007). Thus, a court reviewing a complaint's scienter allegations under the PSLRA must "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  <u>Id.</u> at 322.  The court must determine whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  <u>Id.</u>

The <u>Tellabs</u> analysis also requires a "comparative evaluation," under which courts consider "not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged."  <u>Id.</u>  "A complaint will survive . . . only if a reasonable person <u>would</u>—not just "<u>could</u>"—"deem the inference of scienter cogent and at least as compelling as any opposing inference [of nonfraudulent intent] one could draw from the facts alleged."  <u>Id.</u> at 324 (emphasis added).  "An inference of fraudulent intent may be plausible, yet less cogent then other, nonculpable explanations for the defendant's conduct."  <u>Id.</u> at 314.

In addition, the Ninth Circuit has ruled that to satisfy the PSLRA's scienter pleading requirements, a plaintiff must "plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." Zucco Partners, 552 F.3d at 991 (quotation marks omitted). The Ninth Circuit defined the "deliberate recklessness" standard, "as a form of ***intentional or knowing misconduct***." Id. (emphasis added). More specifically, "although facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, they are not sufficient to establish a strong inference of deliberate recklessness." Id. Rather, the plaintiff must plead "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Id.

As articulated more fully below, under both Tellabs and the Ninth Circuit's standard, Plaintiffs have not adequately pled a strong inference of scienter and, therefore, the Complaint must fail.

### 1. Restating Financial Statements Does Not Give Rise To A Strong Inference Of Scienter

In attempting to meet their scienter pleading requirement, the Complaint primarily relies on the fact that the Company restated its financial reports. See Compl. ¶¶ 10, 14-15, 53-65. Plaintiffs do not support their assertion of scienter with any statements of O'Donnell that would reflect his intention to defraud or his "extreme recklessness." Nor does the Complaint claim to rely on any confidential witnesses that may support a finding of scienter. Rather, the Complaint supports its assertion of scienter merely by referencing the Company's public decision to revise its financials. Id. However, "as a general rule, a restatement of financial data due to an

accounting error, without more, is insufficient to create a strong inference of scienter." Medicis, 689 F. Supp. 2d at 1203-04; see also Weiss v. Amkor Tech., Inc., 527 F. Supp. 2d 938, 948 (D. Ariz. 2007) (securities fraud plaintiff "cannot allege scienter simply because" company "restated its financial statements;" instead, "complaint must allege specific facts that each individual defendant knew that the accounting for the subject transactions was incorrect at the time it was determined").  Here, the Complaint does not contain such an allegation relating to O'Donnell.

Further, GAAP accounting standards are "far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions." Thor Power Tool Co. v. Comm'r, 439 U.S. 522, 544 (1979).  Indeed, "[t]here are [nineteen] different GAAP sources, any number of which might present conflicting treatments of a particular accounting question." Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 101 (1995).  Thus, GAAP standards "tolerate a range of reasonable treatments, leaving the choice among alternatives to management." Thor Power Tool, 439 U.S. at 544.  Given the number of potentially conflicting sources and good faith but aggressive interpretations of accounting principles, allegations of GAAP violations are insufficient to raise an inference of scienter. DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 390 (9th Cir. 2002) ("[M]ere allegations that an accountant negligently failed to closely review files or follow GAAP cannot raise a strong inference of scienter.").  This is so, "even if the GAAP violations are significant or *require large or multiple restatements*." Medicis, 689 F. Supp. 2d at 1203 (quotation marks omitted and emphasis added).

The Ninth Circuit has recognized only two "narrow" exceptions to this general rule that a restatement of financials due to an accounting error is insufficient to create a strong inference of scienter. See Zucco Partners, 552 F.3d at 1000.  First, a restatement due to accounting errors

may be sufficient to establish a strong inference of scienter under those limited circumstances where "'the nature of the relevant [violation] is of such prominence'" or obviousness "that it would be absurd to suggest that management was without knowledge" of the violation. Medicis, 689 F. Supp. 2d at 1204 (citing Zucco Partners, 552 F.3d at 1000).   Second, an accounting violation "may itself be indicative of scienter where it is combined with 'allegations regarding . . . management's role in the company' that are 'particular and suggest' that the defendant must have known its accounting methodology was wrong." Id.   (quoting South Ferry, 542 F.3d at 785).  Neither of these exceptions applies in this case.

> a. The Complaint Fails to Allege an Accounting Error that
>    Was So Obvious that O'Donnell Must Have Been Aware
>    that The Company's GAAP Interpretation Was Incorrect

Plaintiffs fail to satisfy the first exception because the Complaint does not allege that the Company's accounting methodology was so obviously mistaken or that its interpretation of GAAP rules was so egregiously irrational that O'Donnell must have known that it was in violation of GAAP.  In order to prevail under this narrow exception, a "plaintiff must prove that the accounting practices were ... an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made" were so irrational, that no accountant "would have made the same decisions if confronted with the same facts." In re Software Toolworks, Inc. Sec. Litig., 50 F.3d 615, 628 (9th Cir. 1994) (quoting In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1426 (9th Cir. 1994)).

This exception requires meeting a "high standard" and is "difficult to meet." Medicis, 689 F. Supp. 2d at 1206.  For example, in DSAM, the Ninth Circuit rejected an argument that an auditor must have consciously disregarded improper revenue recognition because it had access to the documents revealing the improper revenue recognition at the very time it

conducted the audit.  288 F.3d at 390.  The court found that this fact alone "does not strongly compel an inference of intentional or deliberately reckless conduct as opposed to ordinary carelessness."  Id.  Because the plaintiffs failed to allege any facts to establish that the audit was "such an extreme departure from reasonable accounting practice that [the auditor] knew or had to have known that its conclusions" were false, the Ninth Circuit affirmed dismissal of the complaint.  Id.

Similarly, in Medics, a misinterpretation of a GAAP provision caused the defendant company to restate its financial statements.  689 F. Supp. 2d at 1199.  The court found that the inference that the company took an aggressive interpretation of GAAP with approval from its auditor was more compelling than the inference that the company recklessly ignored a patently obvious GAAP provision.  Id. at 1206-07.

Here, the Complaint fails to allege with any specificity that the Company and its auditor's interpretation of GAAP represented "such an extreme departure from reasonable accounting practice" such that it would be absurd for O'Donnell to be unaware that the Company's approach ultimately did not satisfy GAAP.  See DSAM, 288 F.3d at 390.  Indeed, the Company specifically sought advice from its auditors and an outside accounting firm.  Ex. 1 at 6.  The Complaint fails to offer any obvious accounting rule that specifically contradicts the Company's accounting methodology.  Nor does the Complaint cite to any GAAP rule that mandates independent corroboration of prices for licenses and/or services provided by counterparties when relying on ASC 845-10-30.  Moreover, even if such an accounting rule did exist, the Complaint has not alleged any facts suggesting that O'Donnell must have known about such rule or guideline or deliberately ignored it.  See Medicis, 689 F. Supp. 2d at 1205 ("And, even if [GAAP rule] does apply outside of the software industry, Plaintiffs have alleged

no facts suggesting that [defendant's] senior management … must have known about [the GAAP rule] or deliberately ignored it.").

Rather, as articulated more fully below, the inference that the Company adopted an aggressive interpretation of GAAP with its auditor's approval is more compelling than the inference that the Company—let alone O'Donnell—recklessly ignored a patently obvious GAAP provision. Thus, because the Complaint entirely fails to allege that the Company's mistaken accounting methodology was so patently obvious that O'Donnell must have known at the time that the Company was in violation of GAAP, the first exception does not apply.

> b.  The Complaint Does Not Allege Sufficient Facts to Support
>      their Allegation that O'Donnell Must Have Known The
>      Company's GAAP Interpretation Was Incorrect

The Complaint also fails to meet the second exception wherein it must allege "specific admissions from top executives" or "particular details" which illustrate that the executives must have been aware that the original statement was false or misleading.  Zucco Partners, 552 F.3d at 1000.   The Complaint fails to satisfy this narrow exception because it does not allege particular facts suggesting that O'Donnell knew that the Company was in violation of GAAP when it issued its original Quarterly Reports.  Rather than providing any specific allegations of admissions from O'Donnell or other specific allegations demonstrating that O'Donnell knew that the interpretation or application of GAAP was incorrect, the Complaint merely points to several publicly known innocuous facts in support of purported scienter.   However, as articulated below, these facts do not support a strong inference of scienter—neither individually or as a whole.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### i.  Size of Restatement

The Complaint alleges that because the Company's restatement affected three quarters of financial statements and caused a restatement of a large portion of the Company's revenue, the restatement itself creates a strong inference of scienter.  See Compl. ¶¶ 121-130.  However, as articulated above at length, allegations of GAAP violations are insufficient to raise an inference of scienter "even if the GAAP violations are 'significant' or 'require large or multiple restatements.'"  Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc., 633 F. Supp. 2d 763, 795 (D. Ariz. 2009), judgment vacated in part on reconsideration, 690 F. Supp. 2d 959 (D. Ariz. 2010).

### ii.  O'Donnell's Correspondence With SEC

The Complaint also alleges that O'Donnell's role in responding to the SEC raises a compelling inference of scienter.  See Compl. ¶¶ 131-133.  However, this is not the case. O'Donnell's correspondence with the SEC merely demonstrates that he was aware of the GAAP provisions at issue and aware of the Company's accounting methodology—not that he knew its interpretation or application of GAAP was wrong. See Broderick v. PricewaterhouseCoopers LLP, 169 F. App'x 496, 499 (9th Cir. 2006) ("Nor does [Company's] letter to the SEC prove that [its auditors] knew its representations were false when made."); see also Yourish v. Cal. Amplifier, 191 F.3d 983, 996-97 (9th Cir. 1999) (only a later "I knew it all along" admission is sufficient to satisfy the "false when made" standard); see also Medicis, 689 F. Supp. 2d at 1208 ("allegations that … management monitored the [transactions at issue] … does not support the inference that management must have … know[n] that the Company's accounting methodology was in violation of GAAP. Instead, these … allegations merely indicate that management was

1

2

aware of … their … methodology.").   Thus, such allegations are insufficient to satisfy the scienter requirement as to O'Donnell.

3

### iii.   O'Donnell Resignation and SOX Certifications

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

Similarly, the Complaint's allegation that O'Donnell resigned his position and the Company clawed-back some of his incentive compensation also fails to raise a strong inference of scienter.   See Compl. ¶¶ 134-138.   The Ninth Circuit has clearly ruled that "[w]here a resignation occurs slightly before or after the defendant corporation issues a restatement, a plaintiff must plead facts refuting the reasonable assumption that the resignation occurred as a result of restatement's issuance itself in order for a resignation to be strongly indicative of scienter." Zucco Partners, 552 F.3d at 1002.   That is, the Complaint must plead facts to refute the reasonable presumption that the employee resigned simply because the "errors that lead to the restatement occurred on his watch or because he failed adequately to supervise his department," and not because he committed intentional fraud.   Id.   Here, the Complaint fails to allege any facts refuting the reasonable presumption that O'Donnell resigned and agreed to a partial claw-back of his incentive compensation simply because the errors that lead to the restatement occurred on his watch or because he failed adequately to supervise his department.

19

20

21

22

23

24

25

26

The Complaint also alleges that boilerplate Sarbanes-Oxley ("SOX") certifications signed by O'Donnell are strongly indicative of scienter.   See Compl. ¶¶ 69-71, 84, 94, 135. However, the Ninth Circuit has expressly held that "Sarbanes–Oxley certifications are not sufficient, without more, to raise a strong inference of scienter on the part of Defendant." Glazer Capital Mgmt., LP v. Magistri, 549 F.3d 736, 747 (9th Cir. 2008); see also Zucco Partners, 552 F.3d at 1003-04 ("required certifications under Sarbanes–Oxley section 302(a) … ***add nothing substantial to the scienter calculus***….") (emphasis added).   Indeed, "allowing

27

28

Sarbanes–Oxley certifications to create an inference of scienter in every case where there was an accounting error or auditing mistake made by a publicly traded company would eviscerate the pleading requirements for scienter set forth in the PSLRA." <u>Zucco Partners</u>, 552 F.3d at 1003-04.  Rather, a "Sarbanes–Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." <u>Glazer Capital</u>, 549 F.3d at 747.

Here, the Complaint lacks any specific allegations demonstrating that O'Donnell was severely reckless in certifying the accuracy of the financial statements.  Therefore, O'Donnell's SOX certifications fail to raise a strong inference of scienter and do not make Plaintiffs' otherwise insufficient allegations more compelling by their presence in the Complaint.

*iv.   Company's Size and O'Donnell's Position*

The Complaint's allegation that because the Company only had 18 employees and O'Donnell was its CFO, he was, therefore, "intimately familiar with all material aspects of the Company's operations and financial reporting" also fails to raise a strong inference of scienter as a matter of law.  <u>See</u> Compl. ¶¶ 26, 140.  As argued above, O'Donnell's alleged familiarity with all material aspects of the Company's financial reporting merely reflects his awareness of the Company's accounting methodology.  It does not, however, reflect knowledge that the Company's interpretation or application of GAAP was wrong, which is the critical fact the Complaint must allege with specificity in order to plead scienter under the PSLRA.  <u>See</u>, <u>e.g.</u>, <u>Medicis</u>, 689 F. Supp. 2d at 1208.

Similarly a defendant's corporate "position alone creates a strong inference of scienter only in the ***extraordinary*** case where it is absurd to suggest that a defendant did not know of the violation or misstatement." <u>Medicis Pharm.</u>, 689 F. Supp. 2d at 1214 (internal quotation marks

omitted and emphasis added); see also S. Ferry, 542 F.3d at 784 ("Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the [individual] defendants' actual exposure to information, it will usually fall short of the PSLRA standard").  Here, the fact that O'Donnell served as the Company's CFO is insufficient to raise a strong inference of fraud given that the Complaint fails to specifically allege that he was aware that the Company's accounting methodology was improper.

### v.   Defendants' Motive to Commit Fraud

Finally, the Complaint's attempt to allege scienter based on the allegation that O'Donnell had a motive to commit fraud in order to attract capital for the Company fails as a matter of established Ninth Circuit law.  See Compl. ¶¶ 143-148.  In the first instance, as mentioned above, while "facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, they are not sufficient to establish a strong inference of deliberate recklessness."  Zucco Partners, 552 F.3d at 991. Rather, the Complaint must plead "a highly unreasonable omission, involving . . . an extreme departure from the standards of ordinary care . . . that is either known to the defendant or is so obvious that the actor must have been aware of it."  Id.

Here, the Complaint lacks such allegations.  Its allegations about the Company's private placement of stock during the class period do not contain enough relevant comparative history to create a strong inference of scienter by O'Donnell.  Mere generalized assertions about "routine business objectives, without more" cannot support strong inference of scienter.  Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1038 (9th Cir. 2002) (finding that defendant's alleged desires to obtain favorable financing were ordinary and appropriate corporate objectives, which,

without more, cannot support strong inference of scienter). "To create a strong inference of scienter, therefore, the corporate stock sales must be significant enough and uncharacteristic enough to cast doubt on the defendant company's motives." Zucco Partners, 552 F.3d at 1006. Here, Plaintiffs fail to allege that the Company's stock placement was in any way inconsistent with the Company's traditional business practices—let alone how such an act gives rise to O'Donnell's scienter. Accordingly, the Complaint's allegations that O'Donnell had the motive to commit fraud simply fail to establish a strong inference of scienter.

### 2. The More "Compelling" Inference Is That O'Donnell Acted Appropriately Upon Advice From The Company's Auditor and an Outside Accounting Firm For A Reasonable Interpretation of GAAP

Even where, as here, none of the Complaint's allegations of scienter is individually cogent or compelling enough to survive under the PSLRA, the court, upon a motion to dismiss, must also "consider the complaint in its entirety" to determine whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter." Tellabs, 127 S.Ct. at 2509. However, when conducting this holistic review, the court must also "take into account plausible opposing inferences" that could weigh against a finding of scienter. Id. That is, even if a set of allegations may create an inference of scienter greater than the sum of its parts, "it must still be at least as compelling as an alternative innocent explanation." Zucco Partners, 552 F.3d at 1006.

Here, even taken together as a whole, the Complaint's allegations are not as cogent or compelling as a plausible alternative inference—namely, that although the Company failed to obtain sufficient documentation to independently corroborate the prices of the Counterparties' licenses and/or services, there was no specific intent to fabricate the accounting misstatements at issue here. Instead, the facts alleged in the Complaint, and included in the public filings

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

referenced in the Complaint, support the conclusion that O'Donnell, upon the advice of the Company's auditors and another outside accounting firm, sought to understand and comply with the relevant GAAP rules.  <u>See</u> Ex. 1 at 6.  Indeed, the Complaint fails to allege that the Company relied upon the wrong GAAP rules and principles.

The <u>most</u> compelling and cogent inference here is that the Company did, in fact, rely upon the correct GAAP principles.  That is, under GAAP, it was proper for the Company to book revenues based on the value of the licenses and/or services it received.  The Company's only failure was its inability to independently substantiate and corroborate the third-party prices.  As such, the Company was, at most, negligent in its failure to maintain proper internal accounting controls to ensure it procured all the necessary documentation.

This error notwithstanding, it remains more plausible that O'Donnell intended to comply with GAAP rather than that he was systematically using accounting manipulations to make the Company seem more financially successful.  The facts that: (1) the Company sought and relied upon the advice of its auditor and an outside accounting firm; (2) disclosed in public filings during the class period both its accounting methodology and the non-cash nature of the transactions; and (3) actively sought to explain its accounting methodology to the SEC—are all consistent only with the non-fraudulent inference.  Therefore, the Complaint must fail.  <u>See</u> <u>Hemmer Grp. v. SouthWest Water Co.</u>, 527 F. App'x 623, 627 (9th Cir. 2013) (affirming dismissal of 10(b) claim for restatement of financials because inference of scienter was not as compelling as the inference of negligence).

**B.  <u>The Complaint Includes Alleged Misstatements That Are Contradicted By The Company's Public Filings Referenced In The Complaint</u>**

The Complaint includes allegations of purported O'Donnell's misstatements that are contradicted by the public documents referenced in the Complaint.  While on motion to dismiss

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

on grounds of Rule 12(b)(6) a court must accept as true the complaint's allegations, the "court need not, however, "accept as true allegations contradicting documents that are referenced in the complaint or that are properly subject to judicial notice." Lazy Y Ranch Ltd. v. Behrens, 546 F.3d 580, 588 (9th Cir. 2008); see also Robertson v. DLJ Mortgage Capital, Inc., No. CV-12-8033-PCT-LOA, 2012 WL 4840033, at *7 (D. Ariz. Oct. 11, 2012), aff'd (Mar. 29, 2013) ("Where a plaintiff's own allegations are contradicted by other matters asserted, relied upon, or incorporated by reference by that plaintiff in the complaint, the district court is not obligated to accept the allegation as true in deciding a motion to dismiss."). Accordingly, the Court should not accept as true the Complaint's allegations that are directly contradicted by the Company's public filings referenced in the Complaint, as articulated below.

The Complaint incorrectly alleges that O'Donnell admitted that "the fair values of the technology and products exchanged or received in the transactions were not 'determinable within reasonable limits,' and, hence, the criteria for recognizing revenue in connection with such transactions were not 'met.'" Compl. ¶ 72a.   However, the Company—and by extension O'Donnell—did not admit that its Non-Cash Transactions were not, *per se*, "determinable," implying that the transactions were <u>inherently</u> incapable of being determined.   Rather, the Company stated that it had not procured sufficient documentation in support of the transactions. <u>See</u> Ex. 1 at 5-6. This distinction is critical—while the former statement may imply reliance on the incorrect GAAP principles, the latter statement is consistent with the Company's view that it relied on the proper GAAP principles and that it only erred in failing to gather sufficient documentation in time for its annual audit.

The Complaint also incorrectly alleges that "The Company recognized revenue in connection with the subject transactions despite the fact that there was no 'fixed or determinable

price . . . .'"  Compl. ¶ 72a.  However, nowhere in the public filings did the Company make such an admission.  Finally the Complaint incorrectly alleges that Defendants admitted that the "Company had no evidence or backup documentation supporting the supposed 'rates' and 'prices.'"  <u>See</u> Compl. ¶¶ 15, 16.  However, the Company merely stated that it failed to procure "sufficient support," not that it had no backup documentation whatsoever.  Ex. 1 at 6.

Accordingly, because the record contradicts the Complaint's allegations regarding these alleged misstatements, the Court should not rely on them in deciding this motion.

## II.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 20(a)

The Court should dismiss the second cause of action for control person liability under Section 20(a) of the 1934 Act.  "To state a claim for control person liability [under Section 20(a)], a plaintiff must successfully allege the existence of a securities law violation."  <u>Cali v. Rosenberg</u>, 45 F.3d 435 (9th Cir. 1994).  Here, as shown above, the Complaint fails to set forth a viable claim under Section 10(b) of the 1934 Act.  Because the Complaint fails to state a claim for a primary violation of Section 10(b) and Rule 10b-5, its control person claim under Section 20(a) likewise fails.  <u>See</u> <u>In re Yahoo! Inc. Sec. Litig.</u>, 611 F. App'x 387, 390 (9th Cir. 2015).  Accordingly, the Court should dismiss this claim.

<u>**CONCLUSION**</u>

For the foregoing reasons, Mr. O'Donnell respectfully requests that the Court dismiss the Complaint with prejudice.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: Tucson, Arizona
       February 5, 2016

Respectfully submitted,

**LAW OFFICES OF A BATES BUTLER III LLC**

By: /s/A. Bates Butler III
A Bates Butler III (AZ002417)
bates@abbutlerlaw.com
177 N Church Ave., Ste. 1013
Tucson, AZ 85701
Tel: 520-624-6200
Fax: (520) 624-6204

**SICHENZIA ROSS FRIEDMAN FERENCE LLP**

By: /s/Mendy Piekarski
Mendy Piekarski (*pro hac vice*)
61 Broadway, 32nd Floor
New York, NY 10006
Tell: (212) 930-9700
Fax: (212) 930-9725
mpiekarski@srff.com

*Counsel for Defendant Edward O'Donnell*